THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRUCE THOMAS, Defendant-Appellant.

Second District   No. 85—0238

Opinion filed July 9, 1986.—Rehearing denied August 8, 1986.

G. Joseph Weller and William A. Delaney II, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert Morrow, State's Attorney, of Geneva (Kenneth R. Boyle, of State's Attorneys Appellate Prosecutor, of Springfield, and William L. Browers and Peter M. Tumminaro, both of State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, Bruce Thomas, was found guilty in a jury trial of the offenses of attempted rape and attempted deviate sexual assault (Ill. Rev. Stat. 1983, ch. 38, par. 8—4(a)) and was sentenced to concurrent two-year terms of probation with a condition that he serve six months of imprisonment in the Kane County jail.

Defendant raises four issues on appeal: (1) whether the identification testimony was sufficient to prove defendant guilty beyond a reasonable doubt; (2)whether there was sufficient proof that defendant intended to rape the victim; (3) whether the two offenses are carved from the same physical act and preclude separate convictions; and (4) whether the trial court erred in not allowing defendant to present evidence and argument that his brother committed the crimes.

The charges stem from an occurrence in the early morning hours of June 10, 1984. The complaining witness testified that she attended two parties near her home in Elgin on the evening of Saturday, June 9, 1984, and early morning of Sunday, June 10, 1984, the first at the Martin Luther King Lodge and the second at Robert Johnson's residence, 485 Fremont. She stated that she saw defendant at both parties, but she didn't know him or talk to him. She also stated that she had seen him at work at Motorola in Schaumburg 10 or 20 times on breaks, although they worked in different departments, and that she had seen him two weeks prior to the incident at another party at the Johnson home, where parties were regularly held. She did not know his name.

Complainant testified that she left the second party alone around 4:30 a.m. and started to walk home, which was about a block and a half from the Johnson home. As she walked up Fremont she heard someone running behind her, but turned around and didn't see any-

one. As she turned onto Porter Street, defendant was standing right next to her, about 2 or 3 feet away. She testified that he said, "you don't have to worry, I'm not going to hurt you or rape you or anything like that, I'm goin' home." Then he said, "you know me, don't you," and she said no and turned around, looked at him, and said, "you tried to talk to my girlfriend" and he said "oh yeah." They were about 5 feet from a street light, and she looked at his face "for a second." He then went on across the street and she continued walking home. When defendant was about 15 or 20 feet away from her, she testified that he stopped and faced her and that he had his pants unzipped, with his penis exposed. He ran at her and she started to run across the street toward the back of Ann Street where her house was located. Defendant ran through the bushes and grabbed her. At this time they were right across the street from the street light and she was able to see his face. She testified that he then pushed her to the ground, knocking off her glasses, straddled himself over her with his knees on her arms, and ripped her dress down the front. At this time, his face was about 6 inches from her. He then ripped off her underclothes.

Complainant stated that defendant, his knees still on her arms, then touched her around the mouth with his penis and "told me to suck him or he's gonna beat my ass." She kept turning her head and he reached back and touched her in her "private area." He then tried to hold her head still and continued to try to put his penis in her mouth without success, telling her to "come on." She was struggling to get free and tried to bite him on the arm, but couldn't say for sure if she actually bit him or not. He tried to keep her from screaming by putting his knee on her throat, but she cried out and defendant got up and ran. She testified she heard a noise which might have been a car going by right before he ran. She put her glasses back on and, when he was about midway across the yard, he started coming back again, his penis still exposed. She screamed and he turned around and ran down Ann Street. She immediately ran to her house and called the police. She described her attacker to the police and three days later identified defendant from photographs shown to her by the police.

On cross-examination, she testified that she told the police her attacker was about 25 to 26 years of age, between 5 feet 7 inches and 5 feet 9 inches, and stated that he was wearing a long-sleeved, light-colored shirt and dark slacks or jeans, that he may have had a mustache or goatee and that his hair was in a "Jheri Curl." She stated she also told the police that she may have seen him at the party on Fremont, that she was not sure that she could recognize her attacker if she saw

him again, and that she may have bitten him on the left arm. She testified that she was unsure whether she could identify him because she was so upset at the time. She did not tell the police that the suspect worked at Motorola or that she had seen him at a party two weeks previously. She had a total of five alcoholic drinks that evening. Complainant also testified that at the time of the attack any light poles were at least 35 feet away, that she can't see too well without her glasses, and that the problem with her eyesight is that she can't see far away. She stated she can recognize features on someone only 6 inches away.

Complainant further testified that several days after the attack, she remembered that her attacker had talked to her friend Annette at the previous party. Her ex-boyfriend, Allison Jones, gave her the name of a possible suspect, someone who worked with her at Motorola, and she informed the police who later showed her the photographs from which she identified the defendant. She thought she had seen the defendant somewhere before the attack, but just could not recall where.

She testified that defendant, at the time of trial, had a different hairstyle than at the time of the attack although his facial hair was the same except thinner around the mustache. She stated there was no doubt in her mind that the person in the courtroom, the defendant, was the one who attacked her the morning of June 10, 1984.

Complainant's roommate at the time of the attack testified that defendant came to their apartment June 17, 1984, and asked to see complainant. She stated that defendant told her that he wasn't the one who did it, but said he was at the party on the night in question and complainant saw him there and probably got him mixed up with somebody else.

Officer Robert Jacks of the Elgin police department testified that he was the first to talk to complainant after her report and that she was very upset and emotional at the time and it was difficult to get information from her. He corroborated her testimony as to her description of the attacker and her description of what happened. He stated that complainant told him that she had no idea who the attacker was, that he may have been at the same party or she may have just seen him in the neighborhood, and that she didn't think she'd be able to recognize him again. He did not recall complainant telling him of a conversation where defendant said "you know me, don't you?"

Officer Scott Davis testified that he showed complainant a photo lineup of eight pictures on June 13, 1984. She didn't make any identification from the first four photographs, but when she picked up the

card containing the second set of pictures her expression changed and "[h]er eyes got wider, mouth kind of opened and she pointed to Picture No. 5 *** and then said oh my god, that's him." He also identified a photograph of defendant's right arm taken June 18, 1984, showing a scab of some sort on the arm. Called again as a rebuttal witness, Davis stated that he talked with defendant, who changed his story regarding where he was at the time of the offense as he had to contact some of his friends to find out what he did that weekend, but never said he'd been at the party that night.

Defense witnesses James Bradley and Robert Johnson, Jr., testified that defendant was not at the party the early morning of June 10. Justine Kelly stated she was defendant's fiance and that defendant was with her June 9 and stayed until 4 or 5 a.m., but on cross-examination said it was a Friday night and Saturday, not Saturday night and Sunday that he was with her although she said she was getting the days mixed up. She also testified that she telephoned complainant June 28, 1984, who told her that defendant didn't do it or try to do it. Kelly stated she then offered complainant some money not to testify. Cassandra Walker testified that defendant was at her home on Saturday, June 9, until about 11 or 11:30 p.m. and was wearing red shorts, a red shirt and tennis shoes. Donna Freeney, defendant's roommate at the time of the offense, testified that defendant arrived home around 11 p.m. or midnight that Saturday night and was wearing red shorts, a red top, gym shoes and socks. He went to bed in his own room and got up around 9 or 10 a.m. the next morning. She testified she did not actually see him between the time she went to bed and got up the next morning, but stated she could hear the front door opening or closing.

Errington Michael Parker testified that he and defendant played softball together at Motorola twice a week and that defendant hurt his arm sliding into base June 12, 1984, and the injury looked like a scrape mark. Defendant's brother, Fred Thomas, testified that he lives in Missouri, but was living in Elgin at the time of the offense; that he was at the party on Fremont June 10 from 2—2:30 a.m. to 4 a.m. or maybe 5 a.m., and that he was wearing a long-sleeved brown and tan shirt and gray baggies, that his hair was styled in a "Jheri Curl" or "Classic Curl" and that he had a mustache and a little hair on his chin. He is 5 feet 9 inches and was 18 at the time of the offense. He further stated that he did not see defendant at the party during the time he was there and that he had, on occasion, previously told people he was defendant, including at a party on Fremont two weeks prior to the offense. He stated that he didn't know complainant

and he never attacked her.

Defendant testified that he is 24 years old and is 5 feet 8 inches, weighs 155 pounds and, at the time of the offense, had a "Care-free" or "Jheri Curl" hairstyle, a mustache and small amount of hair on his chin. On June 9, he worked at Motorola until 12:30 p.m. and then slept at Cassandra Walker's until 6 p.m. He left there about 11:30 p.m. and then went home. He went to bed and got up about 9 or 9:30 a.m. the next morning. On the previous evening he was wearing a red T-shirt with no sleeves, red jogging shorts, gray and red socks and blue sneakers. Defendant stated that he wore these same clothes three days in a row. He also stated that he received a gravel mark on his arm playing softball June 12, and that the photo that complainant picked out of the photo lineup was taken in 1980 when he was about 19. It was taken in connection with his arrest on a resisting-arrest charge for which he received court supervision. He denied telling complainant's roommate that he was at the party June 10. He testified that he never saw complainant prior to June 17, 1984, that he did not attend the party on Fremont on June 10, and that he never attacked her.

■ Defendant first contends that he was not proved guilty beyond a reasonable doubt because complainant's identification was doubtful and uncertain. Defendant argues that complainant did not have an adequate opportunity to really observe her attacker because of the frightening nature and brevity of the attack, the fact that the attack took place during the predawn hours, and the fact that complainant had been drinking and lost her glasses. He also maintains that her identification is suspect as she told the police after the attack that she didn't think she could recognize her attacker if she saw him again and that she "might" have seen him at the party, yet testified at trial that she saw him at both parties, as well as the fact that defendant's name was suggested to her by friends following the attack. He also points to the similarities in appearance between himself and his brother Fred, and the fact that the photo she picked out as a picture of her attacker was taken when defendant was 19, Fred's age at the time of trial.

A conviction cannot be deemed to be sustained beyond a reasonable doubt by the evidence if identification of the accused was vague and doubtful (People v. Ash (1984), 102 Ill. 2d 485, 494, 468 N.E.2d 1153), although, where identification of the accused is at issue, the testimony of a single witness is sufficient to support a conviction, even in the presence of contradictory alibi testimony, provided the witness is credible and viewed the defendant under circumstances

which would permit a positive identification (*People v. Yates* (1983), 98 Ill. 2d 502, 525, 456 N.E.2d 1369). The trier of fact is not required to accept defendant's alibi testimony over the positive identification by the victim even if the alibi testimony was given by a greater number of witnesses. (*People v. Shelby* (1984), 123 Ill. App. 3d 153, 165, 462 N.E.2d 761.) The standard for a positive identification is whether the witness was close enough to the accused for a sufficient length of time under conditions that provided adequate opportunity for observation. *People v. Simmons* (1985), 138 Ill. App. 3d 492, 498, 485 N.E.2d 1135.

Here, complainant testified she engaged in a brief conversation with defendant under a streetlight and his face was 6 inches from hers during the attack. She also gave an extremely accurate description of defendant immediately following the attack, and she picked defendant's picture out of a photo lineup. Even considering that complainant had about a drink an hour that night and her glasses were knocked off, the evidence was sufficient to show that she was close enough to defendant for an adequate period of time to make a positive identification. See *People v. Simmons* (1985), 138 Ill. App. 3d 492, 498-99, 485 N.E.2d 1135 (where complainant's in-court identification of the defendant held credible even though no light was on in the bedroom at the time of the attack, complainant was nearsighted and not wearing her glasses, her initial description was not precisely accurate and she had failed to identify defendant in photographic lineups).

Also, complainant testified that there was no doubt in her mind that defendant was the one who attacked her. Any inconsistencies between complainant's testimony and other evidence concerning complainant's statements to the police may be explained by the fact that she talked with the police at a time when she was nervous and frightened, immediately after the attack. (See *People v. Redman* (1986), 141 Ill. App. 3d 691, 703, 490 N.E.2d 958.) A complainant's identification testimony has also been found credible where the defendant's identity was suggested to the complainant by another witness. See *People v. Shelby* (1984), 123 Ill. App. 3d 153, 163-65, 462 N.E.2d 761.

▉ The credibility of complainant is an issue best determined by the trier of fact, who heard the testimony and observed the demeanor of the witnesses (*People v. Watts* (1985), 139 Ill. App. 3d 837, 851, 487 N.E.2d 1077), and the determination made by the trier of fact with respect to the weight given the identification testimony will not be upset unless it is so contrary to the evidence that it cannot be justified (*People v. Dixon* (1985), 133 Ill. App. 3d 1073, 1082, 480 N.E.2d 128). A criminal conviction will not be set aside unless the evidence is

so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) That is not the case here. The complainant's testimony was clear and convincing, and the jury was entitled to believe complainant's testimony and disbelieve the alibi defense provided by defendant as well as to believe that it was defendant, and not his brother Fred, who attacked the complainant. On this record, defendant was proved guilty beyond a reasonable doubt.

■ Defendant next contends that his attempted-rape conviction should be reversed as there is no evidence showing an intent to rape complainant. He contends there is no evidence to show that the attacker intended to have sexual intercourse with complainant, but showed only an attempt to seek sexual satisfaction in another manner. Defendant argues that the attacker at no time approached complainant's vagina with his penis and at no time stated that he wanted to have sexual intercourse, but only demanded oral stimulation.

Attempted rape includes every element of the crime of rape except penetration. (*People v. Sprouse* (1981), 94 Ill. App. 3d 665, 672, 418 N.E.2d 1070.) To commit attempted rape, the male must intend to accomplish intercourse by force and against the female's will and must take a substantial step toward accomplishing his purpose. (*People v. Rogers* (1985), 135 Ill. App. 3d 608, 619, 482 N.E.2d 639.) This intent, however, may be inferred from the surrounding circumstances (*People v. Triplett* (1970), 46 Ill. 2d 109, 112, 263 N.E.2d 24), which include the conduct of the defendant, the character of the assault, the acts done, and the time and place of the occurrence (*People v. Williams* (1984), 128 Ill. App. 3d 384, 396, 470 N.E.2d 1140).

Here, the evidence established that defendant took a substantial step toward accomplishing intercourse. *People v. Fleagle* (1984), 129 Ill. App. 3d 298, 472 N.E.2d 155, involved a factually similar situation. In that case, the defendant also was convicted of attempted rape and attempted deviate sexual assault. Defendant there apparently had tried to pull the complainant's head toward his erect penis. Defendant contended that, although the complainant's testimony might be sufficient to support his conviction for attempted deviate sexual assault, it was not sufficient to support his conviction for attempted rape, arguing there was no testimony indicting that he made an overt move toward the genital area of complainant. The court determined, however, that testimony showed that complainant awoke to find that her skirt and slip and had been pulled to her waist, her blouse was open and defendant was nude and kneeling between her legs. This evidence was sufficient for the trial court to find that defendant had the intent to

commit rape and had taken a substantial step toward the commission of the offense. The appellate court stated that the fact that the assailant's intent was not verbalized and that consummation was successfully prevented does not establish a lack of intent to rape. 129 Ill. App. 3d 298, 302, 472 N.E.2d 155; see also *People v. Bonner* (1967), 37 Ill. 2d 553, 562, 229 N.E.2d 527.

The defendant's reliance upon *People v. Pitts* (1980), 89 Ill. App. 3d 145, 411 N.E.2d 586, is misplaced because the factual situation in *Pitts* is distinguishable. The court in *Pitts* determined that the circumstances did not establish an intent to commit the specific offense of rape because defendant made no overt move toward the victim's genitals, made no reference to intercourse, and obtained sexual satisfaction without intercourse by ejaculating while lying on top of the victim who was face down on the floor and while both remained fully clothed. (89 Ill. App. 3d 145, 147, 411 N.E.2d 586.) Moreover, once defendant experienced an orgasm, he fled.

■ The situation here is clearly different. The defendant tore off complainant's clothes, including her underwear, his penis was exposed, and he fondled complainant's genitals. He held her down by pinning her arms with his knees and was in a position then to also facilitate sexual gratification by oral stimulation. Tearing off her clothes is clearly unnecessary to commit the type of deviate sexual assault attempted here and shows an intent to commit another crime, that being rape. From these actions, an inference that defendant intended to have sexual intercourse with complainant is not, as he contends, mere speculation. A court of review is not required to throw away common sense when the record clearly demonstrates that the trial court's finding of guilt is supported by the evidence beyond any reasonable doubt. (*People v. Testa* (1983), 114 Ill. App. 3d 695, 701, 449 N.E.2d 164.) Even though defendant also attempted to perform an act of deviate sexual assault, it is apparent that defendant was prevented from physically accomplishing his intent to rape only by complainant's resistance and by the interruption of a passing car. As in *People v. Fleagle* (1984), 129 Ill. App. 3d 298, 472 N.E.2d 155, the circumstances here are sufficient to show an intent to commit rape.

■ Defendant next contends that as this incident was of short duration at the same location with the same individual and the acts occurred almost simultaneously as part of a continuing act, there is no basis for two sex offense convictions. He argues that one of the convictions should be vacated on "one act—one crime" grounds, relying primarily on *People v. Ford* (1980), 83 Ill. App. 3d 57, 403 N.E.2d 512.

The standard of determining when a conviction must be vacated on "one act—one crime" grounds is set out in *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838. The supreme court held that where more than one offense stems from a series of incidental or closely related acts *and* the offenses are not by definition lesser included offenses, convictions with concurrent sentences can be maintained. The court stated:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. *Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses.* Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense." (Emphasis added.) (66 Ill. 2d 551, 566, 363 N.E.2d 838.)

See also *People v. Dixon* (1982), 91 Ill. 2d 346, 355-56, 438 N.E.2d 180; *People v. Myers* (1981), 85 Ill. 2d 281, 287-89, 426 N.E.2d 535.

Applying this test to the facts here, it is evident that the offenses of attempted rape and attempted deviate sexual assault are based on closely related but separate acts. Each requires proof of a different element. A conviction for attempted rape requires proof of a substantial step toward having sexual intercourse with a female by force and against her will. (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4(a), 11—1(a).) A conviction for attempted deviate sexual assault requires proof of a substantial step toward compelling any other person to perform or submit to any act of deviate sexual conduct by force or threat of force. (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4(a), 11—3(a).) Neither crime, therefore, is a lesser included offense of the other as a lesser offense does not have any element that is not included in the greater one. (*People v. Blake* (1985), 130 Ill. App. 3d 948, 955, 474 N.E.2d 892.) The separate and distinct acts of defendant were: (1) knocking complainant to the ground and ripping her clothes off, which is sufficient for attempted rape; and (2) kneeling on her arms and attempting to put his penis in her mouth, which is sufficient for attempted deviate sexual assault. There were two "overt or outward manifestation[s] which will support a different offense." (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838.) It was not a single act of defendant which resulted in his two convictions. See *People v. Luigs* (1981), 96 Ill. App. 3d 700, 708-09, 421 N.E.2d 961.

Defendant, however, contends that the incident was one continuing act and only one of the convictions can stand based on *People v. Ford* (1980), 83 Ill. App. 3d 57, 403 N.E.2d 512. *Ford* involves the offenses of indecent liberties with a child and attempted rape based on a line of cases holding that the charges of indecent liberties with a child and of another sex offense cannot be founded on a single act of the defendant. (83 Ill. App. 3d 57, 74-75, 403 N.E.2d 512.) Thus, we do not find *Ford* controlling.

■ While the acts here are closely related, defendant's attempt to put his penis in complainant's mouth is a distinct act toward commission of the offense of deviate sexual assault only. The other, separate acts of defendant in knocking complainant to the ground, ripping her clothes off, and placing his hand on her "private area" support a distinct attempt to rape even though the knocking to the ground and restraint of complainant may also be closely related to the intent to commit deviate sexual assault. Both convictions may stand.

■ Defendant's last contention is that the trial court erred in precluding him from introducing evidence and presenting argument implicating his brother as the perpetrator of the attack on complainant. He contends that the evidence presented in his offer of proof clearly demonstrated the necessary connection between his brother, Fred Thomas, and the incident. Defendant made an offer of proof as to what four defense witnesses, his mother, two sisters, and a niece, would testify to if called as witnesses. In essence, their testimony regarding the possibility that Fred Thomas was the perpetrator of the crime was that Fred had impersonated defendant in the past, that there was a strong physical resemblance between Fred and defendant, that shortly after the offense, Fred cut his hair short, shaved off his goatee and mustache, and became subdued, and that Fred had said that he was at the party complainant was at the evening in question and had come running home at 5 a.m. out of breath. The court ruled that the testimony did not establish the requisite specificity showing that Fred committed the crimes to allow the proffered evidence. The trial court did allow Fred Thomas to testify and defendant was permitted to ask him if he impersonated defendant. He said that he did and had done so two weeks before at a party. He also testified that he was at the party on the night in question, that he did not know the complainant, and that he did not attack her. He stated that defendant was not at the party.

An accused may attempt to prove that someone else committed the crime with which he is charged (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696; *People v. Nitti* (1924), 312 Ill. 73, 90, 143

N.E. 448), but if the circumstances are too remote or speculative, such evidence is properly excluded (*People v. Dukett* (1974), 56 Ill. 2d 432, 449-50, 308 N.E.2d 590). The general rules of admissibility of evidence are applicable to this question. (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696.) Whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable, and a trial court may reject offered evidence on the grounds or irrelevancy if it has little probative value due to its remoteness, uncertainty or possibly unfair prejudicial nature. (101 Ill. 2d 443, 455, 463 N.E.2d 696.) The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. 101 Ill. 2d 443, 455-56, 463 N.E.2d 696.

In cases with facts somewhat analogous to those in the case at bar, the appellate court decisions have generally found that remote, nonspecific, and speculative evidence that the crime could have been committed by another is properly excluded. (*People v. Smith* (1984), 122 Ill. App. 3d 609, 461 N.E.2d 534 (evidence that another suspect matching the description of the perpetrator who is found in the area of the crime and initially arrested excluded as remote connection with crime); *People v. Foley* (1982), 109 Ill. App. 3d 1010, 441 N.E.2d 655 (evidence that testifying accomplice has a brother who fits description of perpetrator of crime excluded as not showing he was involved in the crime); *People v. King* (1978), 61 Ill. App. 3d 49, 377 N.E.2d 856 (evidence that another person had been investigated who physically resembled perpetrator and had a prior arrest for one of the crimes charged was excluded as too conjectural).) As stated in *People v. Nitti* (1924), 312 Ill. 73, 143 N.E. 448, "[i]t is *** difficult, in dealing with evidence of this character, to define the precise limits which must control its admission." (312 Ill. 73, 90, 143 N.E. 448.) If evidence can be introduced concerning a remote or nonspecific possibility that another may have committed the crime, trials could go on *ad infinitum* and juries could become hopelessly confused with speculative evidence. (See *People v. King* (1978), 61 Ill. App. 3d 49, 54, 377 N.E.2d 856.) Thus, defendant must show a clear abuse of the trial court's decision excluding this evidence.

Here, there is no direct evidence that defendant's brother committed the crimes. Fred Thomas denied he committed the crimes, and none of the proffered witnesses were prepared to say Fred committed the offenses. At most, defendant's immediate family, people who obviously were biased in defendant's behalf, were only willing to offer testimony which might cause speculation that Fred could have

committed the crimes, but which did not directly implicate him. In view of the uncertainty of this evidence proffered by defendant's family members, the trial court did not abuse its discretion in refusing admission of this evidence.

Affirmed.

NASH, P.J., and UNVERZAGT, J., concur.