THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM E. CARINI, Defendant-Appellant.

Second District   No. 2—92—0683

Opinion filed December 29, 1993.

2

Robert L. Best, of Arlington Heights, for appellant.

Michael J. Waller, State's Attorney, of Waukegan, and Brian L. Buzard, of Mt. Morris (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

After a bench trial, defendant, William E. Carini, was convicted of three counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(a)(1) (now 720 ILCS 5/12—14(a)(1) (West 1992))). The trial court sentenced defendant to 20 years' imprisonment on count I and imposed six-year terms of imprisonment on counts II and III to run concurrently with one another, but to run consecutively to count I. On appeal, defendant claims that (1) the State failed to prove beyond a reasonable doubt that he was the individual who committed the offenses, and (2) he is entitled to a new trial because the State failed to disclose a suspect list compiled by the police containing the names of persons who fit the description the victim gave of her attacker.

The charges in this case stem from an attack that occurred in the early morning hours of June 3, 1991. Illinois State Police Officer James Gentilcore testified that he was directed to proceed to Valparaiso, Indiana, to investigate a sexual assault that allegedly occurred on Interstate Highway 94 near the Grand Avenue exit. Gentilcore arrived at the complainant's residence in Valparaiso and obtained a description of the attacker from her. Complainant described her attacker as a white male in his late twenties to early thirties who weighed approximately 175 to 180 pounds, was 5 feet 7 inches tall, had "dark fuzzy cut hair," was clean shaven, and had a one-quarter-inch scar above his right lip.

Gentilcore submitted this description to an analyst who gave Gentilcore a computerized list of potential suspects. This list contained names of individuals who lived in the general area of the site of the attack and matched the description provided by complainant. The list contained more than 100 names.

Gentilcore testified that he selected defendant's name from the list because defendant was the only person whose name appeared on the list who resided near the site of the attack. Gentilcore explained that all of the other potential suspects listed resided in counties farther south or west of the attack site. Gentilcore obtained a photograph of defendant from the Wheeling, Illinois, police department and returned to Valparaiso on July 17, 1991.

Gentilcore met complainant at the automobile dealership where she was employed. Gentilcore and complainant entered an office and sat down at a desk. Gentilcore told her that he had six photographs of individuals who may or may not have been her attacker. Gentilcore testified that the men in the black and white photographs had charac-

teristics similar to those of the attacker as described by complainant. Gentilcore included the picture of defendant that he obtained from the Wheeling police department in the six-photograph lineup.

Gentilcore testified that complainant looked at the photographs for about four to five minutes and tentatively identified defendant as her attacker. She told Gentilcore that the hair was exact and the chin was perfect, but she did not like the angle of the chin in the photograph. Gentilcore asked her if she would like to view a color photograph of any individual in the lineup. Complainant asked to see a color photograph only of defendant. She looked at the color photograph and tentatively identified defendant as her attacker. Complainant informed Gentilcore, however, that she could not be absolutely certain of this from viewing defendant only from the angle depicted in the photograph.

Gentilcore further testified that he visited defendant at his home on September 4, 1991. He noticed that defendant had a very light moustache and a scar above his left lip that was approximately one-quarter-inch long. Gentilcore testified that after this visit he telephoned complainant and asked her if she was sure about the scar. She responded affirmatively and stated that the scar was on the right side of the assailant's face. Gentilcore asked complainant if the scar was on the assailant's right side or her right side as she looked at him. According to Gentilcore, she responded by saying, " 'I'm sorry. I should have told you before. It was his right side as you looked at him or his left side.' "

Gentilcore also testified that he asked complainant to come to the police station to view an in-person lineup. Complainant came to the station on October 17, 1991, and Gentilcore told her that each individual in the lineup may or may not be the person who attacked her. The six lineup participants entered the viewing room in a single-file line. Gentilcore testified that, when defendant entered the viewing room, complainant started to back away from the viewing window. She appeared emotionally upset and kept looking at defendant.

After about 10 to 15 minutes, Gentilcore walked over to complainant and attempted to comfort her. He asked her if she could identify an individual and told her that it was okay if she could not. Complainant identified defendant. Gentilcore could not recall if any of the lineup participants was asked to speak. Gentilcore made an in-court identification of defendant as the person complainant selected from the photographic and in-person lineups.

On cross-examination, Gentilcore testified that complainant did not appear to be under the influence of alcohol when he first spoke to

her on June 3. Complainant did inform Gentilcore, however, that she had been drinking at a relative's home on the day of the attack. Gentilcore also testified that he did not possess any photographs of defendant without a moustache and that defendant had a moustache on the date of the in-person lineup. He also admitted that each of the six men shown to complainant in the photographic lineup had a moustache. Gentilcore also noted that the person depicted in a computer sketch based on complainant's description was clean-shaven.

After viewing defendant from the witness stand, Gentilcore testified that defendant has a scar on his forehead between his eyes, a scar on his left cheek bone, a scar running from his mouth down along his left cheek, and a scar running through his right eyebrow. Gentilcore admitted that complainant did not make a positive identification of defendant after viewing the color photograph of defendant. Gentilcore conceded that complainant may have looked at the people in the in-person lineup for 19 to 20 minutes before saying anything and that each individual in the lineup was asked to step forward and say "do what I tell you or I will kill you."

Complainant testified that, on June 2, 1991, she was visiting her brother who lived near Milwaukee, Wisconsin. That day she attended a family picnic. She left the family gathering between 11 p.m. and 12 a.m. and went to her brother's home. She left her brother's home at about 1:30 a.m. on June 3 and began driving to her home in Valparaiso, Indiana. Complainant testified that she drove a car owned by the dealership where she worked and that two other people from the dealership used the car before she received it. Her roommate also drove the car occasionally.

Complainant was driving southbound on Interstate 94 when she became tired and decided to stop driving. She pulled onto the shoulder of the highway somewhere near the Grand Avenue exit. She could not remember for certain what time this was but thought it was about 3 or 3:30 a.m. She left the doors unlocked and the windows rolled down. Complainant partially reclined the seat and fell asleep.

After hearing a noise, complainant woke up and felt a knife pressed against her throat. She looked over and saw a man kneeling in the passenger's seat. The man told her to do as he said or he would kill her. The man had her fully recline her seat. At this point she was able to see the man's face which was about two feet from hers. The man had a square jaw, "nappy" hair, and a very prominent scar on his upper lip.

The man got on top of her and attempted to put his penis in her vagina. He was unsuccessful, so he spit on his hands and wiped his

saliva on complainant and himself for lubrication. He then proceeded to have vaginal intercourse with her. She asked him to stop because it was painful, but he continued. After about five minutes, he ceased. Complainant testified that as far as she could tell, the attacker did not ejaculate at any time during the attack.

The man then pulled complainant by her hair and put her head facedown in the backseat so that her upper body was over the console that is between the front seats. The man attempted to have anal intercourse with complainant. He was again unsuccessful, so he spit again and used his saliva in a similar fashion as before. He then had anal intercourse with complainant. During this time, complainant begged him to stop several times, but he continued.

The man continued the anal intercourse for about 5 to 10 minutes and then pulled complainant by her hair and forced her back into the driver's seat. He pulled her head into his lap and forced her to perform oral sex on him. She bit his penis, and the attacker cried out in pain and threw her head off his lap. The passenger door opened and he tumbled out of the car.

Complainant testified that, of the approximately 30 minutes the man was in her car, she was able to view his face for a total of about 10 to 15 minutes. She was not able to see his face during the time he forced her to have anal intercourse. She also testified that she closed her eyes several times during the attack. Complainant testified that it was not completely dark inside the car. She could not remember whether she was parked under any streetlights. The dome light inside her car was on and it was beginning to get light outside.

After the man fell out of the car, complainant sped away. She drove into Indiana without stopping. She stopped at a gas station in Indiana, purchased a cup of coffee, and went home. Upon arriving home, she got into the shower. While in the shower, she discovered blood between her legs. She got out of the shower immediately and telephoned Porter Memorial hospital. She was instructed to bring her clothes to the hospital and not to take a shower.

Complainant arrived at the hospital, and a doctor examined her and took samples. Complainant testified that she had bruises on her arms, legs, and back. Complainant spoke with police officers while she was at the hospital. Later that day, she met with Officer Gentilcore at her home, where she gave him a description of her attacker. Complainant's testimony regarding the photographic lineup corroborated that of Officer Gentilcore. She testified, however, that, after viewing the black-and-white photographs, she "wasn't real sure" whether defendant was the man who attacked her. She felt more certain about

her identification, however, after viewing the color version of the same photograph. Also, complainant's testimony regarding the in-person lineup corroborated that of Officer Gentilcore. In addition, she testified that she recognized defendant as her attacker as soon as he entered the viewing room. She also stated that each lineup participant was asked to speak and that she recognized defendant's voice. Complainant made an in-court identification of defendant. She stated that the only thing different about defendant was his moustache, which he did not have on the date of the attack.

On cross-examination, complainant testified that she started consuming alcoholic beverages at about noon on June 2. She stated that, during the course of the entire day, she consumed one bloody Mary and six to eight beers. She also stated that she did not consume any alcoholic beverages between the time she arrived at her brother's home at about 11 p.m. and the time of the attack. Complainant opined that she was not intoxicated at any time on June 2 or June 3.

Complainant testified that she could not remember the exact location where she pulled over, but that it was somewhere south of the Grand Avenue exit. Complainant never saw any other cars parked nearby either before or after the attack. She also testified that she fell asleep with her eyeglasses on and that she could not remember how long she slept. She admitted that she could not see her attacker's face during the times that he forced her to perform anal and oral sex with him. Complainant also testified that she took the prescription drug Lopressor on the date of the attack.

Complainant further testified that she told Officer Gentilcore that it would be difficult for her to identify her attacker from the photographic lineup because all of the men in the photographs had moustaches. Gentilcore explained to her that the photos could be dated or very recent and it was possible that her attacker had a moustache at one time but shaved it off.

On redirect examination, complainant testified that, on June 2, she drank six to eight beers, but that the bottles from which she drank were not the regular 12-ounce size. She also testified that she ate several times throughout the day and that between noon and 10 p.m. she ate two bratwursts, a steak, two ears of corn, and some potato salad. When asked why 10 to 15 minutes passed before she identified defendant at the in-person lineup, complainant explained that she was concerned about making an accurate identification.

The State rested and the trial court denied defendant's motion for a directed finding. The parties stipulated that, if Don Vrbycki were called to testify, he would state that he has been a certified latent fin-

gerprint examiner since 1978. He would also testify that he compared complainant's and defendant's fingerprints to a latent fingerprint lifted on June 3, 1991, from a pill bottle found on the front seat of complainant's car and a latent fingerprint lifted on the same date from the glass sunroof of complainant's car. The latent fingerprints lifted from complainant's car and the pill bottle matched the fingerprints of neither defendant nor complainant.

The parties also stipulated that if David J. Turngren were called to testify, he would testify about his qualifications as an expert in the field of forensic science and would testify consistently with the conclusions contained in his report about hair samples removed from complainant's car. Turngren's report was admitted into evidence. The report revealed that some of the hair removed from complainant's car was consistent with hair samples taken from complainant. There was one Caucasian pubic hair recovered from complainant's car that was dissimilar to samples taken from complainant and samples taken from defendant. None of the hair recovered from the car was similar to defendant's hair.

Lawrence Wille testified that he is defendant's stepfather and had known defendant for five years. On the weekend of Saturday, June 1, 1991, defendant was preparing to move into Wille's home in Prospect Heights, Illinois. Wille and defendant spent the weekend finishing the remodeling of Wille's basement so defendant could move into the basement. Defendant and Wille began moving defendant's belongings to Wille's residence on June 2. With the two were defendant's son, nephew, girlfriend and mother.

Wille testified that they finished moving defendant's belongings at about midnight on June 3. He and defendant then watched movies on Wille's VCR until about 2:30 or 3 a.m. Everyone else had retired for the evening. Wille and defendant finished watching movies and went to sleep immediately thereafter. Wille slept until about 7 a.m. and defendant slept until about 10 a.m. Wille testified that defendant has had a moustache for as long as he has known him and that defendant had a moustache on June 3, 1991.

On cross-examination, Wille testified that the moustache that defendant had on June 3, 1991, was as thick as it was at the time of the trial and that he had seen defendant with a thin moustache in the past. He also testified that he and defendant watched two movies that day, but he could not remember the titles of those movies. Wille stated that he did not wake up at all between 3 a.m. and 7 a.m on June 3 and that he never fell asleep during the time that he and defendant watched movies.

Defendant's testimony regarding his alibi corroborated that of Wille. Defendant testified that the Grand Avenue exit on Interstate 94 is 24 miles from Wille's home via Willow Road and Interstate 294. He also testified that he was not in Lake County at any time on June 2, or June 3, 1991, that he had a moustache on those dates, and that he did not sexually assault complainant.

On cross-examination, defendant testified that the moustache he had at the time of trial was about as thick as the moustache he had on June 3, 1991. He explained that his moustache may have appeared lighter on June 3, 1991, and on the date he first met with Officer Gentilcore because the summer sun tends to lighten his hair color. Defendant also testified that the lease on the apartment where he lived immediately prior to moving in with Wille expired late in April or early in May. When asked why he lived in that apartment until early in June, one month after his lease expired, defendant responded that he stayed on his security deposit.

Defendant's first argument on appeal is that the State failed to prove him guilty of aggravated criminal sexual assault beyond a reasonable doubt. In assessing whether the evidence against a defendant was sufficient to prove guilt beyond a reasonable doubt, a reviewing court must view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (*People v. Furby* (1990), 138 Ill. 2d 434, 455.) A defendant's conviction should not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt about the defendant's guilt. *Furby*, 138 Ill. 2d at 455.

Defendant claims that complainant's unreliable identification, the lack of any physical evidence linking him to the scene of the crime, and the uncontradicted and unrebutted alibi evidence demonstrate that the State failed to prove beyond a reasonable doubt that he was the individual who attacked complainant. Where the identity of the person who committed the offense is at issue, a single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. (*People v. Slim* (1989), 127 Ill. 2d 302, 307; *People v. Thomas* (1986), 145 Ill. App. 3d 1, 7-8.) Factors often helpful in evaluating the reliability of a victim's identification testimony include: (1) the opportunity the victim had to view the offender at the time the offense occurred; (2) the victim's degree of attention; (3) the accuracy of the victim's description of the offender; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5)

the amount of time that had passed between the offense and the identification confrontation. (*Slim*, 127 Ill. 2d at 307-08.) We conclude that complainant's identification of defendant was made under circumstances rendering it sufficiently reliable to support defendant's conviction.

■ Complainant had a sufficient opportunity to view her attacker at the time of the offense. She testified that, although she closed her eyes at times and was not able to see defendant's face at all times during the attack, she was able to view defendant's face for a total of about 10 to 15 minutes. She also testified that the dome light inside her car was on for at least part of the time and that dawn was approaching. This testimony is sufficient to allow a trier of fact to reasonably conclude that complainant had ample opportunity to view her attacker under adequate conditions.

Defendant claims the evidence of complainant's alcohol consumption demonstrates that her degree of attention at the time of the attack could not have been very high. Although complainant admitted she had consumed alcoholic beverages and took a prescription drug on the day before the attack, she also testified that she ate throughout the day, did not consume any alcoholic beverages during the three to four hours before the attack, and was not intoxicated at the time of the attack. The trier of fact was adequately informed of complainant's physical condition that morning and was in the best position to evaluate the effect complainant's physical condition had on her ability to observe and remember. (See *People v. Allman* (1989), 180 Ill. App. 3d 396, 402 (conviction upheld where victim had a blood-alcohol content of "1.53 [*sic*]" but testified that he was able to recall the circumstances of the attack).) The trier of fact in this case could have reasonably concluded that complainant's consumption of alcoholic beverages and prescription drugs the day preceding the attack did not significantly affect her ability to observe her attacker and remember what he looked like.

Defendant next points to the discrepancies between complainant's description of her attacker and defendant's actual appearance. Complainant described her attacker as having only one scar on his face and no facial hair. Other testimony revealed that defendant had several other notable scars on his face and possibly had a moustache on the date of the attack. It is well settled, however, that discrepancies and omissions in identification testimony do not in and of themselves generate a reasonable doubt, but simply affect the weight and the credibility of the testimony. *Slim*, 127 Ill. 2d at 308-09; *People v. Shockley* (1990), 195 Ill. App. 3d 148, 155-56.

⋅ The discrepancies present in this case do not render complainant's identification of defendant uncertain. Complainant was able to give Officer Gentilcore a description of her attacker and positively identified defendant during the photographic lineup, the in-person lineup, and at trial. There was testimony, even from defendant, that defendant's moustache might have appeared lighter around the time of the attack. Complainant's failure to notice it does not necessarily discredit her identification of defendant. (*Slim*, 127 Ill. 2d at 310 (failure to notice facial hair is not fatal to a positive and otherwise credible identification).) While complainant's description of her attacker omitted reference to certain facial scars, this likewise cannot be deemed significant. A witness is not expected or required to distinguish individual and separate features of a suspect in making an identification, and the witness' general description based on the overall impression the attacker's appearance made can be sufficient. (*Slim*, 127 Ill. 2d at 308-09.) Because complainant made a positive identification of defendant, the trier of fact could reasonably conclude that the presence of discrepancies and omissions regarding the attacker's scars and facial hair did not render complainant's identification doubtful or uncertain.

Defendant contends, however, that the evidence demonstrates complainant's identification of defendant was highly uncertain. Although the evidence reveals complainant could not make a positive identification after viewing the black-and-white photograph of defendant, she became more certain of her identification after viewing the color photograph. Also, although a considerable amount of time passed before complainant identified defendant during the in-person lineup, the evidence indicates that she recognized defendant almost immediately after he entered the viewing room. The trier of fact could reasonably conclude that complainant's conduct in these instances was more consistent with a desire to be careful and thorough than with uncertainty and indecisiveness. This is supported by the fact that complainant never identified another person as her attacker prior to the in-person lineup. (*People v. Smith* (1991), 215 Ill. App. 3d 1029, 1036.) Moreover, the complainant testified that she recognized the defendant's voice.

Defendant also claims the passage of time between the attack and complainant's identification of defendant is another factor contributing to the unreliability of the identification. There is nothing in the record indicating that the passage of about 1½ months and 4½ months, respectively, between the attack and the dates of the photographic and in-person identifications had an adverse effect on complainant's identification of defendant. The trier of fact could reasona-

bly conclude that the passage of time involved here did not render complainant's identification unreliable. See *Smith*, 215 Ill. App. 3d at 1036 (conviction based upon identification made over two years after date of offense upheld).

■ Complainant's and Officer Gentilcore's identification testimony was sufficient to sustain defendant's conviction despite the contradictory alibi testimony. (*Slim*, 127 Ill. 2d at 307.) The assessment of the credibility of the witnesses and the weight to be given their testimony, and the resolution of factual disputes, are functions of the trier of fact. (*Slim*, 127 Ill. 2d at 307.) The trier of fact was not required to accept defendant's alibi testimony over testimony of complainant's positive identification even though the alibi testimony came from more than one witness and was uncontradicted. *Thomas*, 145 Ill. App. 3d at 8.

■ Defendant also argues that, because the scientific evidence regarding the fingerprint and body hair comparisons failed to implicate him in any way, the evidence was insufficient to prove him guilty beyond a reasonable doubt. From the circumstances, however, there was no aspect of the scientific evidence which in any way contradicted the victim's positive identification testimony. As we have already stated, the identification testimony of a single witness is sufficient to sustain a conviction. For all of the foregoing reasons, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt of aggravated criminal sexual assault.

Defendant argues that, even if the State proved him guilty beyond a reasonable doubt, he is entitled to a new trial. Defendant claims that he was denied a fair trial because the State failed to disclose to defense counsel the list of potential suspects that Officer Gentilcore used during his investigation. The State contends defendant has waived this issue because he failed to take any action upon learning of the existence of the list and did not raise the alleged discovery violation in his post-trial motion.

The record reveals that the trial court entered an order requiring the State to disclose to defense counsel all information and materials required by Supreme Court Rules 412(a) and (c) (134 Ill. 2d Rules 412(a), (c)). The State submitted a written discovery answer in compliance with the order. Officer Gentilcore was the first witness called at trial, and the existence of the list was revealed at an early point in his testimony. Defendant did not object, request a continuance, move for a mistrial, or otherwise complain about the State's failure to disclose this list. Defendant did not raise this alleged discovery violation in his written post-trial motion, but did raise it in his oral arguments

before the trial court. The court denied defendant's post-trial motion without addressing the State's failure to provide defense counsel a copy of the list.

■ We conclude that defendant has waived his claim of a discovery violation by failing to move for a mistrial, object to the use of the evidence, or request a continuance upon learning of the list. It is now well established that both a trial objection and a written post-trial motion are necessary to preserve appellate review of issues that could have been raised at trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) It has also been held that a defendant who fails to request a continuance after learning of a possible discovery violation, and instead elects to proceed with the trial, waives the issue on appeal. *People v. Robinson* (1993), 157 Ill. 2d 68, 79.

The proper course of action at trial would have been for defendant to move for a mistrial and alternatively request the exclusion of the evidence or a continuance. Defendant claims that without the list he was precluded from rebutting Officer Gentilcore's testimony and investigating the identities, descriptions, and locations of the other potential suspects listed. A continuance may have allowed defendant sufficient time to conduct such an investigation. Even if a continuance proved to be insufficient in this respect, defendant would have established in the record that he considered the list to be important evidence and that he needed a substantial amount of time to address it. (*Robinson*, 157 Ill. 2d at 79.) By failing to take any action upon learning of the existence of the list, defendant did not preserve his contention that he could have materially mitigated the harmful effect of the evidence had he been prepared to meet it. *People v. Stewart* (1992), 227 Ill. App. 3d 26, 29.

Application of the waiver rule in this case is also appropriate because it is not entirely clear that defendant would have been entitled to the list had he made a request for it. This list does not fall within the scope of materials subject to discovery under Supreme Court Rules 412(a) and (c). This list was not a verbatim report or summarization of a witness' oral statement under Rule 412(a)(i) and it was not a document which the State used at trial under Rule 412(a)(v). (See 134 Ill. 2d Rules 412(a)(i), (a)(v).) Also, Officer Gentilcore's testimony reveals that this list did not contain material tending to negate defendant's guilt under Rule 412(c) (134 Ill. 2d R. 412(c)).

The trial court does have the discretion, however, to require the disclosure of relevant materials not explicitly mentioned in Rule 412. (134 Ill. 2d R. 412(h).) The defendant must make a request for such materials and demonstrate that the requested information is material

14

to the preparation of his defense. (134 Ill. 2d R. 412(h).) Defendant made no such request. Although compliance with the discovery requirements is mandatory, the failure to comply does not require a reversal absent a showing of surprise or undue prejudice. (*Robinson*, 157 Ill. 2d at 78.) Because it is not clear that defendant would have been entitled to production of the list or that defendant was prejudiced by the State's failure to provide him with the list, we decline to address the alleged discovery violation as plain error. See 134 Ill. 2d R. 615(a).

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and GEIGER, JJ., concur.