THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JACK G. BRUCE, Defendant-Appellant.

Fifth District No. 5—87—0410

Opinion filed June 21, 1989.

James J. Gomric, P.C., of Belleville, for appellant.

Dick Allen, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

On March 19, 1987, a jury in the circuit court of Madison County found the defendant, Jack Bruce, guilty of two counts of murder in violation of section 9—1(a)(1) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)), home invasion in violation of section 12—11(a)(2) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(2)), and attempt (murder) in violation of section 8—4 of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 8—4). The court entered judgment on the jury's verdicts, and on May 8, 1987, the court sentenced the defendant to two terms of natural-life imprisonment and to two terms of 30 years' imprisonment. All sentences were ordered to be served concurrently. The defendant appeals. We affirm.

On May 1, 1986, shortly after 9 a.m., the bodies of Carl and Susan Hoffman were discovered by Richard Jasudowicz and Earl Davis, co-workers at Carl Hoffman's realty company, at the Hoffmans' home in Granite City, Illinois. Each victim had been shot three times in the head and stabbed numerous times in the chest. The body of Carl Hoffman was found upright on the couch in the living room, near a knife stained with blood. Susan Hoffman's body was found on the floor in front of the couch. Forensic evidence indicated that the victims had been killed sometime during the previous evening and that the assailant had fired the shots at a distance of about one foot from each victim's head.

The co-workers discovered the bodies subsequent to their becoming concerned when neither Carl nor his wife appeared for work. Upon telephoning the Hoffman residence, a co-worker spoke with Jennifer Seago, the five-year-old daughter of Susan Hoffman. In that conversation, the child indicated that she could not wake her mother or her stepfather and that her mother had been hurt. The two co-workers drove to the Hoffman home and were let into the residence by Jennifer. The co-workers discovered the bodies and also detected the strong odor of gas throughout the home.

Emergency medical technicians, fire personnel, and the police shortly arrived at the scene. They discovered that all of the controls on the gas range had been turned on to their maximum, and that a candleholder had been set on a table in the kitchen. A burned match lay at the base of this candleholder, and a puddle of wax indicated that the holder had recently contained a candle which had melted.

The police observed that the front door of the home was locked, while the back door of the home had been forced open. The police found glass around the back door, shell casings and the bloodstained knife in the living room, and other bloodstains near the rear door of the house and in the basement. Outside of the home, in the muddy area near Jennifer Seago's bedroom window, the police observed that someone had left an impression of the heel of a shoe revealing the letters "FLO." The police took blood samples and lifted fingerprints from the scene, and subsequently performed ballistics tests on the shell casings and on the bullets removed from the bodies of the deceased.

The Granite City police department contacted the Major Case Squad of the Greater St. Louis Area (MCS), who interviewed dozens of individuals bearing any relationship to the Hoffmans. On May 2, 1986, Terry May, an officer with the Granite City police department, interviewed the defendant. The defendant indicated that Carl Hoffman had sold some property for him and that he and Hoffman had often played cards together.

At 3 p.m. on May 3, 1986, Officer May contacted the defendant and requested that he come to the Granite City police station for another interview. Shortly afterwards, at approximately 3:07 p.m., the police were advised to proceed to the defendant's home because the defendant had just been shot. Upon arriving at the defendant's home, Steve Willaredt, a Granite City police officer, observed that the defendant was lying near his driveway, had been wounded in the stomach, and was in apparent pain. As an ambulance prepared to take the defendant to the hospital, Willaredt requested the defendant

to give him the keys to his home. The defendant consented. Less than an hour later, Officer May, working independently at the hospital, also received the defendant's consent to search his residence, and received his consent to search his vehicles at approximately 4:10 p.m.

Upon entering the home subsequent to the consent, Alva Busch, a crime scene technician, examined a pair of dirt-covered gray shoes found in the living room. Upon noticing that the shoes were manufactured by Florsheim, and recalling that the shoe impressions found on the broken glass and in the mud at the Hoffmans' home had the same design configuration, Busch replaced the shoes and ordered the officers to leave the home.

The police subsequently obtained a warrant to search the defendant's home. The search revealed numerous items which were later introduced in evidence at the defendant's trial, including: (1) a door knob, found in an adjacent field, that apparently came from the Hoffmans' back door; (2) a gold-colored key, found in the defendant's bathroom, which apparently fit a lock on the door of the Hoffmans' home; (3) a crowbar allegedly used to break open the Hoffmans' back door, and which revealed paint scrapings that matched the paint found on the door; (4) bullets; and (5) an empty box which once contained a gun which the police suspected, and which subsequent ballistics tests on similar weapons confirmed, could have been used as the murder weapon.

Apparently not convinced of the defendant's claim of having been shot by unknown assailants, the police uncovered substantial evidence in support of the suspicion that the defendant had inflicted the wound upon himself in an effort to mislead the authorities. The defendant's next-door neighbor, Connie Busch, related that 5 to 10 minutes before the officers had arrived at the defendant's home, she was in her garden, heard hammering noises, and saw the defendant kneeling near a black bag at the rear of his home. The police found a gun hidden in a bag of peat moss near where the defendant, according to Connie Busch, had been kneeling. The police also found a spent shell casing outside of the defendant's front door. The ballistics of this casing matched the ballistics of the gun found in the peat moss.

The police arrested the defendant on May 8, 1986, and the defendant was indicted on May 14, 1986. On July 21, 1986, the circuit court entered an order granting a trial continuance to August 25, 1986. The defendant's attorney signed his name to this order. At a docket call on August 20, 1986, for cases scheduled for trial on August 25, 1986, the defendant's attorney failed to appear. On August 25, 1986, both the assistant State's Attorney and the counsel for the

defendant met with the trial judge concerning the trial of the case. The defendant's attorney informed the judge that he would confer with the defendant as to the suggested trial date of October 13, 1986, and return with an answer on September 2, 1986. At the docket call on September 2, for cases set for trial September 8, the defendant's attorney appeared and announced that he would submit a formal motion for a continuance. However, soon afterwards, the defendant's attorney telephoned the assistant State's Attorney and stated that he would not request a continuance. As a result, the assistant State's Attorney, on September 8, 1986, filed a "Motion to Declare Delay Attributable to the Defendant." On September 9, 1986, the defendant's attorney filed a response and a petition for *habeas corpus* relief requesting the defendant's discharge and the dismissal of the case for not having been tried within 120 days of the defendant's arrest.

After hearing arguments on September 9, 1986, the circuit court denied the defendant's request for discharge. The court determined that two periods of delay, from July 21 to August 25, 1986, and from August 25 to September 8, 1986, were attributable to the defendant. The defendant was in custody 75 days from incarceration on May 8, 1986, to July 21, 1986; 36 days from July 21 to August 25 (inclusive); and 14 days from August 25 to September 8 (exclusive of September 8). In its order of September 11, 1986, the trial court found that the 36-day delay from July 21 to August 25, 1986, was attributable to the defendant because his attorney had specifically requested that continuance and had signed an order to that effect. The trial court also attributed the 14-day delay between August 25 and September 8, 1986, to the defendant because the court noted that, on August 25, 1986, the defendant's counsel had agreed to a trial date of October 13, 1986, but had failed to notify the court until the first week of September that this date was not acceptable. The court found that the remaining delay did not exceed 120 days and that the defendant was thus not denied his right to a speedy trial.

Prior to the trial of the defendant, the court also denied the defendant's motion to suppress evidence gathered from an alleged improper search of his premises, and granted the State's motion to prevent the defendant from in any way mentioning or discussing the Hoffmans' alleged use and dealing of drugs.

The jury found the defendant guilty, the court sentenced him, and he filed this appeal. The defendant contends on this appeal that: (1) the trial court erred by denying his motion for discharge for the violation of his right to a speedy trial; (2) the trial court erred in not allowing defendant's counsel to inquire as to the alleged drug connection

and criminal activity of the Hoffmans or the Hoffmans' family members; (3) the trial court erred in not suppressing evidence seized from the defendant's residence obtained from an alleged unlawful search; and (4) the State failed to prove the defendant's guilt beyond a reasonable doubt.

The defendant initially contends that the circuit court erred by denying his motion for discharge for the violation of his right to a speedy trial. The defendant claims that the court should have dismissed the charges against him on statutory speedy trial grounds because none of the delay prior to September 9, 1986, was attributable to him. The defendant suggests, in addition, that he did not personally request a continuance.

■ Section 103—5(a) of the Code of Criminal Procedure of 1963 (the speedy trial statute) (Ill. Rev. Stat. 1985, ch. 38, par. 103—5(a)) prescribes that "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." In determining whether delay was "occasioned by the defendant," the criterion in each case is whether the defendant's acts in fact caused or contributed to the delay. (*People v. Fosdick* (1967), 36 Ill. 2d 524, 528-29, 224 N.E.2d 242, 246.) When a defendant's attorney fails to appear in court at the appointed time, the resulting delay is attributed to the defendant. (*People v. Scotti* (1985), 131 Ill. App. 3d 571, 573, 475 N.E.2d 1097, 1099.) A defendant need not be present in person when his counsel requests a continuance because he was present by and through his attorney, and his attorney's request for a continuance constitutes a delay attributable to the defendant. *People v. Siglar* (1971), 49 Ill. 2d 491, 496, 274 N.E.2d 65, 68.

The police arrested the defendant on May 8, 1986, and the defendant was in custody at all times subsequent to that date. It is not contested that the first 75 days of delay until July 21, 1986, were not attributable to the defendant. On July 21, 1986, the trial court entered an order granting a continuance of the trial to August 25, 1986. Circuit Judge P.J. O'Neill subsequently testified that Jim Gomric, the defendant's attorney, had orally requested the continuance and that the defendant's attorney acknowledged that the continuance was on the defendant's motion by signing his name at the bottom of the order.

After hearing arguments of counsel on September 9, 1986, the trial court denied the defendant's request for discharge. The court determined that two periods of delay, from July 21 to August 25, 1986, and from August 25 to September 8, 1986, were attributable to the

defendant. It attributed the 36-day delay from July 21 to August 25, 1986, to the defendant because the evidence indicated that defense counsel had specifically requested a continuance. It attributed the 14-day delay between August 25 and September 8, 1986, to the defendant because the evidence indicated that defense counsel had agreed to a trial date of October 13, 1986, but had failed to notify the court until the first week of September that this date was not acceptable. The court noted that the remaining delay, which it attributed to the State, did not exceed 120 days, and that the defendant was thus not denied a speedy trial.

■ The record clearly supports the trial court's conclusion that sufficient delay was occasioned by the defendant so as to negate his claim for violation of his right to a speedy trial. According to Judge O'Neill, the judge who granted the continuance, defense counsel orally requested a continuance in July of 1986 and signed an order to that effect. The resulting 36-day delay from July 21, 1986, to August 25, 1986, was thus correctly charged to the defendant. The fact that the defendant's attorney requested the continuance, rather than the defendant himself, is of no consequence. (*Siglar*, 49 Ill. 2d at 496, 274 N.E.2d at 68.) The remaining delay did not exceed 120 days, and the defendant's right to a speedy trial was not violated.

The defendant's second assignment of error is that the trial court erroneously excluded testimony tending to show that another person committed the crimes charged to the defendant. Defense counsel sought to inquire as to the alleged drug connection and criminal activity of the Hoffmans in an attempt to show "the actual cause and perpetrator of this offense." On March 12, 1987, the trial court granted the State's motion *in limine* to exclude specific testimony as to whether the victims were involved with drugs and whether they may have been murdered by someone also involved with drugs. The defendant contends that the court should have admitted this evidence because it was relevant to prove the proposition that someone other than the defendant had murdered the Hoffmans.

■ A defendant in a criminal case may prove any facts or circumstances tending to show that another committed the crime with which he is charged. (*People v. Dukett* (1974), 56 Ill. 2d 432, 450, 308 N.E.2d 590, 600, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226.) However, if the evidence is too remote or too speculative (*People v. Thomas* (1986), 145 Ill. App. 3d 1, 13, 495 N.E.2d 639, 647), or if it fails to link a third person closely with the commission of the crime (*People v. King* (1978), 61 Ill. App. 3d 49, 52, 377 N.E.2d 856, 859), then the trial court should exclude the evidence. The trial

court's determination whether to admit the proffered evidence is within its sound discretion, and the court on review will not reverse this determination absent a clear showing of an abuse of that discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702.

In *People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590, the defendants, father and son, were convicted of the armed robbery and murder of a service station attendant and were sentenced to death. At trial, the defendants attempted to offer evidence that a third party, one James Basford, had threatened the murder victim on a number of occasions several months prior to the victim's death. The defendants also sought to introduce the testimony of a police officer that, in the weeks following the crime, Basford had asked the officer about the investigation several times and had asked whether he had been cleared of suspicion. The trial court refused to allow the evidence. After receiving their sentences of death, the defendants took a direct appeal to the Illinois Supreme Court.

That court affirmed, observing that there was nothing in the proffered testimony of either Basford or the police officer that directly connected Basford with the victim's shooting. The court stated that, at most, the evidence tended to show that Basford and the victim disliked each other and that Basford was concerned that he would be charged with the crime. (*Dukett*, 56 Ill. 2d at 449, 308 N.E.2d at 600.) The court noted that the defendant's evidence was properly excluded because it concerned evidence entirely speculative in character. *Dukett*, 56 Ill. 2d at 450, 308 N.E.2d at 600.

Similarly, in the instant case, the trial court properly exercised its discretion when it granted the State's motion and rejected the defendant's offer of proof. The defendant failed to specifically identify any other person who may have murdered the Hoffmans. The defendant's offer of proof, in which he mentioned hearsay evidence which the MCS gathered during their initial investigation of the murders—rumors circulating through the community that several named individuals may have disliked the Hoffmans—indicates that if the court had permitted the defendant to present evidence of the Hoffmans' drug use, the defendant would have suggested that other people had held grudges against the Hoffmans or may have had reasons to want them killed. This evidence clearly was uncertain and remote and thus had little, if any, probative value for the issues in the case.

■ A trial is not an arena in which the contestants are permitted to fling any and all accusations, no matter how remote or absurd. Some limits of admissibility must exist. "[T]here is another test of ad-

missibility than logical relevancy. Some things are rejected as being of too slight a significance, or as having too conjectural and remote a connection; others, as being dangerous, and likely to be misused or overestimated by a jury; others, as being impolitic, *e.g.*, unsafe for the State; others, on the bare ground of precedent." (Thayer, *Presumptions & the Law of Evidence*, 3 Harv. L. Rev. 141, 145 (1889).) If trial courts were required to permit defendants to introduce evidence concerning a remote or nonspecific possibility that others may have committed the crimes charged, trials could go on *ad infinitum* and juries could become hopelessly confused with speculative evidence. (*People v. Thomas* (1986), 145 Ill. App. 3d 1, 13, 495 N.E.2d 639, 647.) Here the trial court correctly exercised its discretion and excluded the evidence "because it would have been entirely speculative in character" (*People v. Dukett* (1974), 56 Ill. 2d 432, 450, 308 N.E.2d 590, 600), and thus too conjectural and remote.

The defendant cites *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, apparently for the proposition that the exclusion of the evidence deprived him of due process. In *Chambers*, the defendant was convicted of the murder of a policeman. The defendant proffered the testimony of three witnesses who would have said that one Gable McDonald had admitted to each witness that he was guilty of the murder charged to the defendant. The Mississippi trial court excluded the testimony on the grounds that it was hearsay and inadmissible under any exception recognized in that State. The Mississippi Supreme Court affirmed the trial court.

The United States Supreme Court reversed, holding that enforcement of the hearsay rule in this instance denied the defendant's right to due process. In so concluding, the Court found sufficient indications of trustworthiness in the underlying circumstances surrounding McDonald's admissions. For example, the evidence disclosed that each of the three witnesses was a close associate of McDonald and that McDonald had made the damaging remarks spontaneously. In addition, the witnesses were corroborated by other facts—including a sworn (although subsequently repudiated) confession by McDonald, testimony of an eyewitness putting McDonald at the crime scene, proof that McDonald owned a gun similar to the weapon used, and evidence that McDonald was seen with the gun just after the shooting—which gave credence to the asserted veracity of the hearsay. Finally, the Court noted that McDonald was present and available for the prosecution to call to the stand if it so chose. In circumstances "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of

justice." *Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049.

The distinction between *Chambers* and the instant case is obvious. In *Chambers*, the defendant could present specific probative evidence tending to prove that some other specific person was the perpetrator of the crime. In the instant case, the defendant was unable to specifically identify any other person who may have murdered the Hoffmans. The evidence that the defendant wanted to present to the jury consisted of highly speculative rumors, uncorroborated, which circulated throughout the community subsequent to the murders. In *Chambers*, the Supreme Court noted that the suspect's, McDonald's, availability strengthened its conclusion that McDonald's admissions were reliable, because "if there was any question about the truthfulness of the extra-judicial statements, McDonald was present in the courtroom and had been under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." (*Chambers*, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1049.) In the instant case, the third-party suspect was not only unavailable, he or she was undisclosed, and the question is thus posed as to whether that suspect even exists.

One final comment on this issue: our role in reviewing decisions of the trial court is a limited one. We must uphold the trial court absent a clear showing of an abuse of discretion. (*People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702.) The trial court granted the State's motion and excluded the defendant's offer of proof because the defendant failed to specifically identify a suspect to whom the evidence would clearly point as the murderer, and because the defendant's theory was entirely speculative hearsay, derived from unnamed persons, and irrelevant to any of the issues at trial. In this instance, we are unable to hold that the trial court's determination to exclude this evidence was an abuse of its discretion.

The defendant's third contention on this appeal is that the trial court erred by not suppressing evidence seized from the defendant's residence which resulted from an allegedly unlawful search. The police initiated their search on May 3, 1986, after the defendant summoned them to his home in regards to a shooting. While the wounded defendant was waiting for an ambulance, Officer Willaredt discovered that the defendant's house was locked. The officer asked the defendant for the key, and the defendant gave it to him. Less than an hour later, at the hospital, Officer Terry May asked the defendant for permission to search his house and vehicles. The defendant consented.

Alva Busch, a crime scene technician, supervised the search of the

defendant's house. While inside the home, Busch noticed a pair of dirt-covered shoes in the living room. Upon inspecting these shoes, Busch observed a design on the heel similar to that of a design found on broken glass and in the mud at the Hoffmans' home. Busch ordered the officers to halt the search. The officers then obtained a warrant, and all subsequent searches of the defendant's house were made pursuant to the warrant. The police seized numerous items from the defendant's home, including: (1) a door knob; (2) a gold-colored key; (3) a crowbar; (4) bullets; and (5) an empty box which had once contained a Jennings pistol.

In his motion before the trial court, the defendant argued that Busch and the other officers searched his home in violation of his fourth amendment constitutional rights. The court denied the defendant's motion because it found that the defendant consented to the search of his home. The items seized from the defendant's home were admitted as evidence during the trial.

■■ ■ Unreasonable searches and seizures are prohibited under the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, §6). A search that is conducted pursuant to consent is one of the specifically established exceptions to the requirements of both a warrant and probable cause before a police search, and a search conducted with a defendant's valid consent is permitted so long as the State can establish that the consent was given voluntarily. (*People v. Koniecki* (1985), 135 Ill. App. 3d 394, 401, 481 N.E.2d 973, 979.) Where the validity of a search rests on consent, the State must prove by a preponderance of the evidence that the defendant's consent was voluntary, and the voluntariness of the defendant's consent depends, not on any single criterion, but on all circumstances surrounding the giving of the consent. (*People v. Posey* (1981), 99 Ill. App. 3d 943, 947, 426 N.E.2d 209, 212, *cert. denied* (1982), 456 U.S. 993, 73 L. Ed. 2d 1289, 102 S. Ct. 2276.) The defendant must give his consent voluntarily, and not as the result of duress or coercion. (*People v. Sommer* (1977), 45 Ill. App. 3d 459, 461, 359 N.E.2d 1190, 1191.) The trial court must determine as a factual matter whether the defendant has given his consent in the particular case, and where the evidence on the issue is in conflict, the review court will accept the trial court's finding unless that finding is clearly unreasonable. *People v. Anderson* (1976), 42 Ill. App. 3d 1040, 1042, 356 N.E.2d 1076, 1078.

In the case at bar, the trial court concluded that the defendant voluntarily consented to the searches of his house both when he gave

his keys to the officers and later while he was in the hospital. From the testimony contained in the trial transcripts, the court's determination was clearly not unreasonable.

■ Prior to the shooting at his home, and at all times relevant to his argument on this issue, the defendant was not in custody. Officer Willaredt testified that the defendant voluntarily gave him the keys to his house. Officer May also testified that the defendant, at the hospital, voluntarily consented to the search of his house and vehicles. Before this search, the defendant was not a suspect in the murders, and the officers' apparent purpose in requesting the search was to investigate the defendant's shooting. Since the defendant had said that he was shot at the entrance to his home, that home could have contained evidence of the shooting. The defendant had asserted that he had grabbed the assailant's gun, and the police apparently hoped to find the gun, or the shell casing, or the assailant's fingerprints, inside the home. Obviously, any of these items would have aided in the assailant's identification. The evidence fails to suggest that the police coerced the defendant's consent or that the defendant was under duress when he gave the consent. On the contrary, Officer May's testimony indicates that the defendant willingly cooperated with the police in order to convince them that he had nothing to hide. Since the trial court's determination that the consent was voluntary was not clearly unreasonable, we must affirm the court on this issue.

■ The defendant's final contention on this appeal is that the jury's guilty verdicts were contrary to the manifest weight of the evidence. The rule is that when presented with a challenge to the sufficiency of the evidence, it is not the function of the court on review to retry the defendant. As the United States Supreme Court observed in *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, "this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) The Court subsequently noted that "[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; see also *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267,

277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.

■■ ■ The State's proof that a defendant committed an offense may be established entirely by circumstantial evidence. (*People v. Williams* (1977), 66 Ill. 2d 478, 484, 363 N.E.2d 801, 804.) In such cases, the proof of circumstances need only be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused, and no one else, committed the crime. (*Williams*, 66 Ill. 2d at 484-85, 363 N.E.2d at 804.) Further, the jury need not be satisfied beyond a reasonable doubt as to each link in the chain of evidence, and it is sufficient if all the evidence, taken together, satisfies the jury of the defendant's guilt beyond a reasonable doubt. (*Williams*, 66 Ill. 2d at 485, 363 N.E.2d at 804.) Proof of guilt beyond a reasonable doubt does not mean proof beyond any possibility of a doubt. *Williams*, 66 Ill. 2d at 485, 363 N.E.2d at 804.

■■ ■ In the instant case, no eyewitnesses are alive who will testify who murdered the Hoffmans. The issue on review before this court is whether the surrounding circumstantial evidence is so strong as to negate all reasonable hypotheses of innocence and leads only to the conclusion that the defendant committed the crimes charged. (*Williams*, 66 Ill. 2d at 484, 363 N.E.2d at 804; see also *People v. Guest* (1986), 115 Ill. 2d 72, 85, 503 N.E.2d 255, 260.) We hold that it is.

At trial, William Davis, a neighbor of the Hoffmans, testified that he had returned home from work between 11:30 and 11:45 p.m. on the evening of the murders and had nearly struck a light-blue Cadillac as it departed from the victims' house. The neighbor testified that the defendant's light-blue Cadillac, depicted in People's exhibit No. 78, was similar to the car that he saw. Pearl MacElroy, a woman employee of a liquor store located less than a mile from the victims' house, and a person who had known the defendant for years, stated that the defendant had entered the liquor store to purchase a package of cigarettes at 11:35 p.m. on the evening of the murders. She was certain of the time because she glanced at the clock when the defendant entered the store, and knew that she would begin closing the store in 15 minutes.

The State also presented expert testimony that paint found on a crowbar seized at the defendant's residence and paint found on the defendant's shoes matched paint found on the victims' back door, and that a glass chip discovered in the defendant's shoe matched glass found on the victims' back door. David Peck, a forensic scientist, testi-

fied that one of the defendant's shoes definitely made the prints found on pieces of broken glass taken from the floor of the Hoffman home. The design on the defendant's shoe also matched a shoeprint found in the mud outside the child Jennifer Seago's window at the Hoffman home.

Richard Waeltermann, a farmhand employed by the defendant, recalled that, on the day of the murders, the defendant returned from Central Hardware with a box of ammunition, and Waeltermann subsequently heard what he thought were shots coming from the defendant's barn. Waeltermann saw nothing unusual about the defendant's arms on the day of the murder, but when he reported for work two days later he noticed cuts on one of his arms. Dr. Obert Lay, a surgeon who treated the defendant on May 3, 1986, also observed these cuts on the defendant's right arm, which he estimated had been on the defendant's arm from 24 hours to five days. Blood found near the Hoffmans' back door revealed that the assailant had probably cut himself on the broken glass from the door. From the evidence of the cuts on his right arm, the assailant who had cut himself on glass at the Hoffmans' on the night of the murders could have been the defendant.

The position of the bodies at the time of the murders leads to an inference that the assailant was someone known to the Hoffmans who was already present in the home at the time of the shootings. If the assailant had entered the home by breaking open the back door, the Hoffmans would have undoubtedly heard the noise and would not have remained on the couch watching television. We also note, from various cosmetic items found near her body, that Susan Hoffman had been removing fingernail polish from her fingers at the time of her violent death, and it is not likely that she would have continued this activity while someone was breaking open her back door. It could also be deduced that after shooting and stabbing the Hoffmans, the assailant had broken open the back door as a ruse, to mislead the police into believing that the murders were the result of a robbery attempt.

The evidence also indicates that the defendant shot himself in the abdomen after the police contacted him to come down to the station and make a statement. The officers who responded to the defendant's call found the defendant near his driveway. The defendant stated that two men had visited his home at the front door and when he saw that one of the men had a gun, he grabbed for it and the gun discharged. The defendant's next-door neighbor testified, however, that 5 to 10 minutes before the officers arrived, she was in her garden and saw the defendant kneeling by a black bag on his back porch. She heard

several noises that she thought were hammering noises and did not look up. She saw no one else around the defendant's house. Later that day, a police officer found a .22 caliber pistol hidden in a bag of peat moss at the rear of the defendant's house. The ballistics of a shell casing found on the concrete porch at the front of the defendant's house matched the ballistics of the gun found in the peat moss.

Under these circumstances, the defendant's self-inflicted wound indicates that he feared that the police suspected him of the murders and that he hoped to dispel that suspicion by showing that he too was a victim, rather than a perpetrator. At the least, it evinces that the defendant was consciously aware of his guilt and tried to cover it up.

The State advanced two possible motives at trial for the defendant's killing of the Hoffmans. First, the evidence indicated that the defendant had lost thousands of dollars playing cards with Carl Hoffman. The defendant had told his girlfriend, Connie Dennis, that he suspected that Carl Hoffman had cheated him and that he would eventually avenge his losses. In addition, after the defendant was unable to obtain financing to purchase a house in Granite City, Carl Hoffman agreed to help him purchase the house, but Carl arranged to have title placed in his own name. According to Dennis, the defendant "was very upset *** he thought Carl Hoffman was trying to double deal him, and trying to stab him in the back."

In summary, the circumstantial evidence that surrounded the murders—including laboratory analyses of the spent projectiles and cartridges, the defendant's crowbar, the glass found on his shoes and the paint found on the crowbar and the shoes, the Florsheim shoes that matched prints found on the broken glass and in the mud at the scene of the murder; testimony that the defendant had owned a gun which could have fired the bullets that killed the victims and that he had an injury to his arm that could have been caused by breaking the glass in the victims' back door; and the overwhelming evidence which indicated that the defendant had shot himself in the abdomen in an effort to redirect the investigation away from himself—proved beyond a reasonable doubt that the defendant, and no one else, murdered the Hoffmans. This evidence was thus clearly sufficient for a rational jury to conclude, beyond a reasonable doubt, that the defendant was guilty of the Hoffman murders.

■■■ On this appeal the defendant also disputes his conviction for the attempted murder of the child Jennifer Seago. The person who murdered the Hoffmans attempted to create an explosion and a fire at the Hoffmans' home to conceal any evidence of the Hoffmans' violent deaths. The assailant turned on the gas on the stove and placed a

lighted candle in the living room. The resulting gas build-up and explosion would have probably immolated the Hoffmans' bodies, and would almost certainly have killed the child sleeping in her bedroom. The defendant contends that the evidence failed to indicate that the perpetrator of the offense ever saw, had contact with, or even knew that Jennifer was present in the home during the murders. The defendant, however, was an acquaintance of the Hoffmans, and must have known that Jennifer, Susan Hoffman's child from her first marriage, lived with the Hoffmans. The heel print found outside Jennifer's window indicates that the defendant paused by that window and viewed the child in her bed. Since the defendant must have known that Jennifer was present inside of the home, the evidence, sufficient to find the defendant guilty of murder, is also sufficient to find him guilty of the attempted murder of the child.

 The jury also found the defendant guilty of home invasion, and the defendant disputes that verdict. The statute proscribing home invasion, section 12–11(a)(2) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12–11(a)(2)), states that "[a] person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present and *** [i]ntentionally causes any injury to any person or persons within such dwelling place." The parties stipulated that the defendant was not a peace officer. The defendant apparently entered the Hoffmans' home with permission and with authority, but later exceeded that authority when he shot and stabbed the Hoffmans. (See *People v. Hudson* (1983), 113 Ill. App. 3d 1041, 1045, 448 N.E.2d 178, 181.) We are thus unable to say that the jury was irrational in finding the defendant guilty of home invasion.

For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.

Affirmed.

WELCH, P.J., and GOLDENHERSH, J., concur.