THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GAMEL BRYANT, Defendant-Appellant.

First District (6th Division)   No. 1—90—3156

Opinion filed January 29, 1993.

1008

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, and Kenneth A. Brady and Mary B. Tribby, both of McDermott, Will & Emery, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Margaret J. Faustmann, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Gamel Bryant, was convicted of the first-degree murder of Weldon Houston (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)) and was sentenced to a term of 30 years. On appeal, defendant contends that: (1) the State failed to prove each and every element of accountability under the applicable statute (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)); (2) the State's accountability case, based only on circumstantial evidence, failed to prove defendant's guilt beyond a reasonable doubt; (3) the trial court committed reversible error by instructing the jury as to the law of accountability; (4) the trial court erred by refusing to dismiss the grand jury indictment against defendant; and (5) the trial court erred by admitting gang-related evidence.

The relevant facts are as follows. Officer Nathan Silas testified that at approximately 11 p.m. on August 11, 1988, he responded to a call of a man shot at 9200 South Langley in Chicago. When he arrived, he observed a large group of teenagers at the scene. He also saw a blue Yugo parked west of the group with the rear passenger window smashed out. Silas learned that the vehicle had belonged to the deceased. The deceased was lying in the grass in a bloodstained shirt with blood coming from his head, the result of several gunshot wounds. Donnell Frazier was at the scene distraught, crying, and very upset.

Silas conducted a search of the scene and found no weapons. He observed that the streetlight at the scene was on when he arrived. He spoke to various witnesses, including Frazier. Afterwards, he and Frazier went to the home of Bruce Owens, who had been involved in the incident leading to the deceased's murder. When they arrived at Owens' house, Silas had a conversation with a man who identified

himself as Owens, but who later turned out to be Jacques Michaud. Michaud gave Silas names and descriptions of various individuals which he passed on to other officers assigned to the case.

On cross-examination, Silas acknowledged that of the 20 or 30 people standing around the scene, he interviewed only Frazier and Jake Reed. The deceased was lying on his back, but Silas did not know whether someone had rolled him over after the shooting. Silas did not know whether the deceased possessed a gun at any time prior to being shot.

The State also called Detective Thomas Krippel. After receiving information from other officers and from Frazier, Krippel went to defendant's home, where he was arrested. Defendant was later placed in a lineup where Frazier identified him. Krippel received a telephone call from a man who identified himself as the codefendant, Stephen Carter. Carter wanted to know why the police had been to his home. Krippel told him that the police had been there in regard to a shooting. Carter stated that he would present himself at the police station. When Carter arrived at the station, he was placed in a lineup where he was also identified by Frazier.

Michaud testified for the State that at approximately 10:30 p.m. on August 11, 1988, he left a restaurant and started riding his bike in the vicinity of 92nd and Langley when a young man, Marcus McCrane, called out to him. McCrane was standing on the northwest corner of the intersection with defendant, codefendant Carter, and another young man. Defendant asked Michaud whether his belt buckle had anything to do with gang involvement, and he said no. Defendant then swung at Michaud and Michaud ducked away. Michaud got off his bike and began wrestling with defendant at which time Carter took Michaud's beeper. Michaud asked McCrane to "get his boys off of [him]." Michaud and defendant continued to wrestle until they heard a siren. At that time, defendant jumped off Michaud and started running.

Michaud left his bike and began walking north. He went to a pay phone and called Frazier, one of his best friends. While he was talking on the telephone, Michaud saw Carter walk by him. Michaud asked Frazier to help him get his pager back. They decided to meet at Owens' house. Michaud admitted using Owens' name to identify himself to police officers and stated that he did so because he had an outstanding traffic warrant and "didn't want to involve [his] name."

Subsequently, when Frazier arrived at Owens' house with a police officer, he told Michaud that the deceased had been shot. Frazier described the persons who were involved, and on the basis of the de-

scriptions, Michaud told the officer that defendant and Carter were the gunmen.

On cross-examination, Michaud stated that he was not present when the deceased was shot. To his recollection, defendant was not carrying a gun at the time he and defendant wrestled.

Dr. Nancy Jones, a Cook County medical examiner, performed the autopsy on the deceased. The autopsy revealed the presence of five gunshot wounds, which she determined to be the cause of death. She recovered one small caliber, copper-coated bullet. She found no evidence that the gun was fired within contact or close range of the deceased, but was unable to determine how far the deceased was from the gun when it was fired. Dr. Jones concluded that the gun was directly in front of the deceased when he was shot twice; however, as to at least one of the remaining shots, Dr. Jones believed that the bullet entered the body and traveled downward, indicating either that the gun was at a point higher than the body or that the deceased was already on the ground when that shot was fired.

Frazier testified for the State that on the evening in question he received a phone call from his friend Michaud. Frazier told Michaud that he would meet him at Owens' house. Frazier was riding his motorcycle to Owens' house when the deceased, a friend of Frazier's, called him over to a phone booth where he was on the phone. Frazier told the deceased where he was going, and they returned Frazier's motorcycle to his house and took the deceased's car.

On the way to Owens' house, Frazier and the deceased stopped to talk to defendant at 92nd and Langley. Frazier asked him if he knew who had been fighting Michaud, and defendant told Frazier that he was the one. Frazier then told defendant that the pager taken from Michaud was his. Defendant informed Frazier that the "folks have the pager." He and defendant went around the corner, while the deceased remained in the car. Frazier saw four or five men standing around and two or three sitting in a car. One of the men standing was Carter.

Defendant approached Carter and said, "[F]olks, give him that pager." Carter gave Frazier the pager and tried to shake Frazier's hand and then "throw up a pitchfork." Frazier gave him a brief handshake but did not "throw up a pitchfork." Defendant became angry and said, "[Y]ou're not right, you're not right. I thought you were folks." Frazier said, "I'm not folks, and I'm too old for that." Defendant then said, "[W]ell, what the hell you doing coming around here if you're not folks *** you'll get whooped like your boy." Frazier said,

"[N]o, you're not going to whoop me." Defendant then asked Frazier, "[Y]ou want to go with me?"

Frazier decided to fight defendant because he would not be able to get away from all of the other men standing around. Frazier and defendant walked to the corner of 92nd and Langley. Carter followed them. At the same time, the deceased backed the car around the corner to where Frazier and defendant were headed. Defendant approached Frazier swinging, and the two began to fight. Frazier knocked defendant down and then heard a gunshot. He heard more gunshots and turned around to see Carter holding a gun, shooting the deceased from a distance of approximately 10 feet. Frazier heard exactly four shots. He saw the deceased fall forward holding his stomach. He did not see a gun or anything else in the deceased's hands.

Frazier yelled to Carter, "[P]ut that up, put that up." Carter froze momentarily, and defendant ran toward Carter saying, "[G]ive me that gun, give me the gun." When defendant reached Carter, Frazier ran south on Langley, thinking that defendant was going to try to shoot him. Defendant took the gun from Carter. While Frazier was running, he heard another gunshot. He turned around and saw defendant standing near the deceased with his hands down holding a handgun. Frazier was approximately 45 feet from defendant at this point. The incident occurred "right by the streetlight." He then ran around a corner, and at this point heard one more gunshot. He turned back around the corner shortly thereafter and noticed that the group of men, including defendant and Carter, had gone. Frazier ran up to the deceased, who was lying facedown bleeding as a result of being shot. He turned the deceased over and held him in his arms. The deceased was taken away by ambulance soon afterward. Frazier later observed that the rear passenger side window of the deceased's car was smashed out.

Subsequently, Frazier accompanied police officers to Owens' house, where Owens and Michaud were waiting. He told them that "they shot Weldon." He identified "them" as "the guy that you [Michaud] was fighting and the guy that was with him," and he gave Michaud a description.

The following day, Frazier viewed two lineups and identified defendant in one lineup and Carter in the other.

On cross-examination, Frazier acknowledged that at no time during the fight between Frazier and defendant or during the shooting did Carter communicate with defendant. He denied seeing a gun in the deceased's hand or seeing him point a gun at Carter. When questioned as to whether he actually saw Carter pull the trigger, Frazier

stated that he saw Carter pointing the gun directly at the deceased from a close distance, and then saw the deceased "going down like holding his stomach." He saw defendant take the gun from Carter, and at this point Frazier started running. Though he heard one gunshot while he was running, he admitted that he did not actually see defendant fire the gun but stated that defendant was standing a short distance from the deceased holding the gun. Frazier acknowledged hearing a total of six shots. He admitted being uncertain who fired the last shot as he was around the corner and could not see who was holding the gun. He denied removing a gun from underneath the deceased after he had been shot. When questioned shortly after the incident, Frazier did not tell police that he initially heard four shots and then two additional shots.

Detective Abraham Taylor was assigned to investigate the crime scene. He testified that he searched the scene but recovered no weapon. A bullet fragment was, however, recovered from the rear headrest on the passenger side of the deceased's blue Yugo. After interviewing Frazier and Michaud shortly after the incident, he attempted to locate defendant and Carter. Frazier did not tell Taylor that he initially heard four gunshots, or that he saw defendant standing over the deceased with the gun.

Taylor testified that he had dealt extensively with Chicago street gangs and was familiar with the street gang that refers to themselves as "folks." Two of their signs are a crossed pitchfork in an up position and the six-pointed Star of David. In his opinion, when an individual uses the hand signal of a pitchfork in an up position, that individual is affiliated with the "folks" gang.

Officer Nathan Silas was recalled by the defense and was questioned specifically about his failure to record in the police report that Frazier had allegedly seen defendant standing over the deceased with a gun or that he initially heard four gunshots and then two additional shots while running down the street. It was also brought out that Michaud named Carter and defendant as suspects in the shooting even though he was not present when the shooting occurred.

Trent Smith testified for defendant that he was with defendant and Carter the night of the shooting. Smith stated that a person approached him on the street, and Smith asked him about the belt buckle he was wearing. Defendant then stopped the individual, and minutes later the two began wrestling. A beeper the individual was wearing fell off his belt, and Carter picked it up. Shortly thereafter, defendant and the individual stopped fighting, and they departed in separate directions.

Twenty or thirty minutes later defendant returned to the vicinity with Frazier, whose name Smith did not know. Smith, Carter and several others were standing around. Smith noticed a blue Yugo driving up at the same time defendant arrived. Defendant approached Carter and asked for the beeper, which Carter gave to him. Defendant in turn gave the beeper to Frazier, and the two then began arguing. Immediately thereafter, defendant and Frazier walked to a nearby corner, and Frazier hit defendant. At the same time, the blue Yugo was backing up on a one-way street. Defendant and Frazier began "exchanging blows." The deceased exited the Yugo carrying a gun and hit defendant on the head. Smith shouted, "He got a pistol." The deceased then turned towards Carter and held the gun towards Carter's face from a distance of 5 or 10 feet. Carter then pulled out a pistol and "shots started going off." Smith recalled four to five shots being fired. The deceased "fell forward on the gun, on the pistol" and "fell face first on the grass."

Defendant ran towards Carter and took the gun out of Carter's hand. He shot the gun one time at the back window of the Yugo, and then he and Carter ran. Defendant was carrying the gun when the two fled. Smith did not see defendant shoot the deceased or point the gun in the deceased's direction. He noticed Frazier run down the street and go around a corner. Frazier returned 20 to 30 minutes later with a guy named "Tuffy." Frazier turned the deceased over and picked up the gun the deceased had allegedly pointed at Carter. He approached Tuffy with the gun, and "they had a discussion" and then left.

On cross-examination, Smith confirmed that he was a friend of defendant and Carter and that they spent a lot of time together. He stated that he was uncertain whether defendant and Carter were part of a gang. Smith denied hearing defendant say to Carter, "[F]olks, give him that pager," but stated that he was not standing within hearing distance of the conversation. Similarly, he never saw Frazier shake hands with Carter, nor did he see Carter attempt to flash him a pitchfork sign.

When questioned about the fight between Frazier and defendant, Smith stated that after the deceased hit defendant on the head with a gun, the deceased and Frazier started "rushing" defendant. When asked about the gun, Smith admitted being uncertain as to whether the "shiny" object the deceased was holding was in fact a gun. The deceased fired no shots according to Smith, and he never heard Frazier yell, "Put the gun up, put the gun up" or defendant say to Carter, "Give me the gun."

Further, Smith admitted that he never told police what he had seen that evening, and in fact the first time he gave his recollection of the events was at trial. The lighting conditions were good. After Carter shot the first time, the deceased grabbed his waist and began to fall forward. He was falling as the other shots were fired. The deceased was holding his stomach area the entire time he was falling. Defendant never told Carter to shoot the deceased.

Erin Williams, nicknamed "Tuffy," testified that on the evening in question, he was sitting on his grandmother's porch when Frazier approached him in a hysterical condition. Frazier told Williams that the deceased had been shot. He accompanied Frazier back to the scene of the shooting. While Williams waited by an alley, Frazier ran across the street to the deceased, who was lying facedown on the ground. He observed Frazier turn the body over on his back and pick up a "shiny object" from underneath the body. Frazier then returned to Williams and attempted to hand Williams a small caliber handgun. Frazier asked Williams if he would "put [the gun] up for him," and Williams refused. Williams then ran back to his grandmother's house and told her to call the paramedics. He has never seen the gun since the night of the shooting.

On cross-examination, he described the gun as a silver .22 to .25 caliber automatic handgun. At no time did Frazier tell him who shot the deceased. Williams never told the police that Frazier tried to give him a weapon the night of the shooting.

Defendant testified that on the evening of August 11, 1988, Frazier and the deceased pulled up in a small light blue car. Frazier exited the passenger side of the vehicle, approached defendant and asked him where his beeper was. Defendant told Frazier he didn't have it. Frazier asked defendant if he was the one who had earlier fought with Michaud, and defendant said he was. Defendant then told Frazier where he could get his beeper, and they began walking down the street together. At the same time, the deceased was driving down the street in the car. When they got to the corner, defendant ran into a group of men, one of whom was Carter. Defendant asked Carter for the beeper, and when defendant received it he turned it over to Frazier. The deceased then told Frazier that they should leave, but Frazier said, "No, that's the guy who had a fight with [Michaud]; I'm fixin' to kick his ass." Defendant looked at Frazier and told him he "was going to do nothing to me." They then walked to the corner and started exchanging punches.

The blue car backed around the corner, and the deceased got out. The deceased approached defendant while he was still fighting with

Frazier and hit him with a gun. Defendant fell to the ground and then heard several gunshots. Frazier began running, while defendant got up and ran over to Carter and took the gun. He ran across the street and shot one time at the back window of the deceased's car and then fled the scene, at some point throwing the gun into some bushes. At no time did he fire any shots at the deceased.

On cross-examination, defendant denied telling Frazier that "folks got the beeper" or telling Carter and the others in the group, "[F]olks, give him the beeper." The deceased hit him with a "hard object" while he and Frazier were fighting. He admitted running over to Carter and taking an automatic handgun out of his hand and shooting out the window of the deceased's vehicle. He also admitted initially telling the police that he didn't know who fired the shots and confessed to trying to hide the handgun after the shooting.

Carter testified that he picked up a telephone beeper from the ground while defendant and Michaud were fighting. Later, when defendant asked him to return the beeper, Carter retrieved it from McCrane and then gave it to defendant. Subsequently, defendant and Frazier began fighting, and he stood by observing the fight. He noticed the deceased get out of his vehicle holding a silver handgun. He saw the deceased hit defendant in the face with it. At that point, Smith shouted, "He has a gun, he has a gun." Carter stated that the deceased then "rushed over towards [him]" pointing the gun at him starting from a distance of 10 to 12 feet. Carter told him twice to stop. The deceased continued to move toward him. Carter stated that he thought the deceased was "fixing to kill [him]." Carter then pulled out his gun and fired it four or five times. Defendant never shot at the deceased.

On cross-examination, Carter stated that the deceased did not begin to fall until after he had fired the fourth shot from his gun. He acknowledged that the deceased never fired a shot from any gun. He also stated that his gun was a .25 caliber automatic which held seven bullets.

When questioned by police initially, Carter admitted telling them that the shots were fired from an unknown location by people unknown to him and later that after he heard the shots he ran down an alley with defendant. He further admitted never telling police that he shot the deceased in self-defense. However, on redirect examination, Carter stated that he did inform the police that the deceased hit defendant on the head with a .25 caliber automatic gun. Carter confirmed that he and defendant had discussed the case at various times up to the time of trial.

On rebuttal, the State called Krippel. Krippel testified that when defendant was arrested the day following the shooting, defendant gave an oral statement to Krippel at which time he stated that some shots had been fired but he did not know from where or by whom. He did not tell Krippel that he fired any shots, although he was not directly asked that question. Krippel also testified as to an oral statement given by Carter in which Carter stated that he was afraid of guns and did not own any weapons.

During the jury instructions conference, defense counsel objected to the State's request to tender Illinois Pattern Jury Instructions, Criminal, Nos. 5.03 and 7.02A (2d ed. 1981 & Supp. 1987) relating to the law of accountability. Defense counsel argued that there was insufficient evidence to find defendant guilty of first-degree murder on an accountability theory. The trial court overruled defense counsel's objection and allowed the instructions to be given to the jury. In addition, the trial court allowed defendant the opportunity to have a second-degree murder instruction given to the jury, which he declined.

Defendant was tried along with his codefendant, Carter, and was found guilty by a jury of first-degree murder. He was subsequently sentenced to 30 years.

Defendant first contends that the State failed to prove the required elements of accountability under the applicable accountability statute (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)) and thus did not prove his guilt beyond a reasonable doubt. The State argues, on the other hand, that the evidence presented at trial was sufficient to find defendant guilty of first-degree murder both as a principal and on the basis of accountability.

When the sufficiency of the evidence is raised as an issue on appeal, the question the reviewing court must answer is " 'whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472-73, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) As the court of review, we must consider that the jury heard and saw the witnesses, and thus was in the best position to judge the witnesses' credibility, to determine the weight to be given their testimony, to decide the inferences to be drawn from the evidence, and to resolve any conflicts in the evidence. (*People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174, 190.) We are not at liberty to substitute our judgment for that of the jury on those issues. Thus, reversal of a conviction is not warranted " 'unless

the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt.' " *Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190, quoting *Young*, 128 Ill. 2d at 51, 538 N.E.2d at 474.

The Illinois accountability statute (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)) holds a person legally accountable for the conduct of another when:

> "Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

Mere presence at the scene of a crime or negative acquiescence in the commission thereof is not sufficient to find a defendant guilty under the accountability statute in the absence of other circumstances. (*Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190; *People v. Carpenter* (1979), 74 Ill. App. 3d 770, 775, 393 N.E.2d 50, 54.) Nor is a defendant's presence at the scene of a crime coupled with flight from the scene enough to prove accountability. *Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190.

Nevertheless, " '[e]vidence of events occurring after the crime [has] been committed is competent to show participation in the crime itself.' " (*Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190, quoting *People v. Ruiz* (1982), 94 Ill. 2d 245, 257, 447 N.E.2d 148, 152.) Thus, proof that a defendant was present during the commission of the crime without disapproving or opposing it, that he fled from the scene, maintained a close association with his companions after the commission of the crime, and failed to report the crime are all factors which a jury may consider in determining the defendant's legal accountability. (*Reid*, 136 Ill. 2d at 62, 554 N.E.2d at 190; *People v. Reed* (1982), 104 Ill. App. 3d 331, 338, 432 N.E.2d 979, 985.) Moreover, " 'words of agreement are not essential to establish a common purpose to commit a crime because the common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct' " (*Reid*, 136 Ill. 2d at 62, 554 N.E.2d at 190, quoting *People v. Ruckholdt* (1984), 122 Ill. App. 3d 7, 10-11, 460 N.E.2d 847, 850), or from evidence of "the spontaneous and combined participation of a group in the perpetration of the offense." *Reed*, 104 Ill. App. 3d at 338, 432 N.E.2d at 984-85.

■ Upon reviewing the evidence in the light most favorable to the prosecution, we are satisfied that a rational jury could well have determined beyond a reasonable doubt that defendant was accountable for the deceased's murder. Though no evidence was presented at

trial that defendant and Carter had a preconceived plan to kill the deceased, the circumstances before, during, and after the shooting were sufficient to establish a common purpose in what may have begun as a spontaneous action on Carter's part.

Although both defendant and Carter denied being members of the "folks" street gang, Frazier testified that when he asked defendant where his telephone pager was, defendant informed him that "folks have the pager." He and defendant then walked together to where Carter and others were standing, and defendant said, "[F]olks, give him that pager." Carter then gave Frazier the pager and tried to shake Frazier's hand and then "throw up a pitchfork." Frazier refused to reciprocate and told defendant and Carter that he was not a "folk." Upon learning Frazier was not a "folk," defendant became angry, and a fistfight between the two ensued.

Carter followed defendant and Frazier to the place where they were about to fight, as did the deceased. There is no question that the deceased and Frazier were together, and that defendant and Carter knew it. While Frazier and defendant fought, Carter fired several shots at the deceased. Defendant then ran up to Carter, grabbed his gun, and fired one or two additional shots. Defendant admitted firing one shot at the deceased's car because "he [was] angry." He did not take the gun from Carter in an attempt to disarm him, but took it to continue the shooting. He and Carter then fled together, and defendant threw the gun into some bushes. Defendant never reported the shooting to police, and in fact told police initially that he did not know who fired the shots.

Further, contrary to what defendant argues, there was evidence presented at trial, both through Frazier and Dr. Jones, to support the State's position that defendant also shot the deceased. Frazier testified that once defendant ran to grab the gun from Carter, he began running. He heard a gunshot, and when he turned around he saw defendant standing near the deceased holding the gun in a downward direction. A total of six shots were fired from the gun. Frazier heard Carter fire exactly four times, and once defendant had possession of the gun, he heard another two shots. Dr. Jones testified that the deceased had been shot five times. One of the bullets traveled downward, indicating in Dr. Jones' opinion either that the gun was aimed from a point higher than the body or that the deceased was already lying down when that particular shot was fired. From this collective testimony, the jury could well have concluded that defendant fired a shot into the deceased.

The State's theory was that the shooting was motivated by defendant's and Carter's anger that Frazier and his companion, the deceased, were not "folks." Defendant tells a contrary story. However, as stated, it is within the exclusive province of the trier of fact to judge the believability of the witnesses testifying at trial. (*Reid*, 136 Ill. 2d at 61, 554 N.E.2d at 190.) We must simply determine whether the evidence of defendant's acts before, during, and after the commission of the murder indicates a common design between him and Carter to commit an unlawful act. We find, after viewing the evidence in the light most favorable to the prosecution, that a rational trier of fact could have so concluded. Moreover, we find that the evidence was also sufficient to find defendant guilty as a principal.

Defendant also argues that the State's case of accountability was based purely on circumstantial evidence, and as such was not proved beyond a reasonable doubt. The law is well settled, however, that "[t]he State's proof that a defendant committed an offense may be established entirely by circumstantial evidence." (*People v. Bruce* (1989), 185 Ill. App. 3d 356, 370, 541 N.E.2d 708, 716; see also *People v. Williams* (1977), 66 Ill. 2d 478, 484, 363 N.E.2d 801, 804.) Further, a conviction based solely on circumstantial evidence will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of evidence. Rather, it is sufficient if all the evidence, when viewed collectively, satisfies the jury of the defendant's guilt beyond a reasonable doubt. *Bruce*, 185 Ill. App. 3d at 370, 541 N.E.2d at 716-17.

■ Although no prosecution witness testified that he actually saw defendant shoot the deceased, the circumstantial evidence presented by the State is not "so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt" either as a principal or as an accessory under an accountability theory. Defendant argues that there was abundant direct evidence which contradicted the State's case. Much of that direct evidence, however, came from defendant, Carter, and Smith, whose testimony the State successfully impeached. When questioned on cross-examination, Smith admitted that he never told the police what he had seen the night of the shooting. The first time he gave his recollection of the events was at trial. Defendant admitted initially telling the police that he didn't know who fired any shots and he also confessed to attempting to hide the gun. Similarly, Carter initially told the police that the shots were fired from an unknown location by people unknown to him, and he never told the police that he

shot the deceased in self-defense. Ultimately, it was the jury's responsibility to resolve any conflicts in the evidence (*Collins*, 106 Ill. 2d at 262, 478 N.E.2d at 276-77), and the jury chose to accept the State's circumstantial evidence over that of defendant. On the basis of the evidence, we cannot say that this conclusion constituted reversible error.

Defendant next asserts that the trial court erred by instructing the jury on the law of accountability. Because of our finding that the State proved its case against defendant beyond a reasonable doubt, we necessarily find that giving the accountability instructions was proper.

■ Moreover, in *People v. Batchelor* (1990), 202 Ill. App. 3d 316, 331, 559 N.E.2d 948, 958, we held:

> "Although submission of an instruction on accountability in the absence of supporting evidence is error [citation], it is proper to instruct the jury on principal action and accountability where the evidence supports both theories. [Citations.] Evidence, however slight, on accountability along with evidence of action as a principal offender is sufficient to support both instructions regardless of whether both theories were advanced in the State's case in chief. [Citation.]"

As we have previously stated, we believe there was sufficient evidence to find defendant guilty of murder both as a principal and under an accountability theory. Thus, we do not find that the trial court erred by instructing the jury as to the law of accountability.

■ Defendant next contends that the trial court committed reversible error by not dismissing the grand jury indictment. In this regard, defendant first asserts that the State used the testimony of Detective Krippel to confuse and mislead the grand jurors, presenting evidence against Carter as though it applied to both Carter and defendant. We find no merit to this contention, however, because any confusion which may have existed was cleared up by Krippel's later testimony explaining in greater detail the events as he understood them to have occurred the night the deceased was shot.

Defendant also argues that Krippel did not have a sufficient basis for his testimony before the grand jury that "[defendant] shot the victim." The trial court, however, found that Krippel's testimony, though conclusory in its form, was sufficiently based on information he had gathered during his investigation, particularly from his interview with Frazier wherein Frazier described what he saw and heard the night of the shooting. Consequently, the trial court concluded that Krippel's testimony was not knowingly false or given in reckless disregard of

the truth, as defendant also alleges. We agree and hold that the trial court's refusal to dismiss the indictment was proper.

Finally, defendant argues that the trial court committed reversible error by admitting gang-related evidence. Defendant asserts that the State's sole purpose in seeking to admit such evidence was to inflame the prejudices of the jury in an effort to convict defendant.

The law in Illinois is clear that, unless the prosecution links the gang-related evidence to the crime charged, that evidence is inadmissible. (*People v. Smith* (1990), 141 Ill. 2d 40, 58, 565 N.E.2d 900, 907.) Evidence indicating a defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design or to offer a motive for an otherwise inexplicable act, provided there is sufficient proof that such membership or activity is related to the crime charged. *Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.

We find that there was sufficient evidence to support the State's theory that the seemingly inexplicable attack on the deceased was gang related. Frazier testified that when he asked defendant where his pager was, defendant replied, "Folks have the pager." Furthermore, when defendant and Frazier approached Carter and the others, defendant said, "[F]olks, give him that pager." Frazier further testified that after Carter gave Frazier the pager, he tried to shake Frazier's hand and then throw up a "pitchfork" sign. Defendant became angry and said, "[Y]ou're not right, you're not right. I thought you were folks. *** [W]hat the hell you doing coming around here if you're not folks *** you'll get whooped like your boy." Frazier said, "[N]o, you're not going to whoop me." Defendant then asked Frazier, "[Y]ou want to go with me?" Defendant and Frazier began fistfighting, and soon after that the shooting occurred. Moreover, Detective Taylor testified that based on his extensive knowledge of Chicago gangs, the pitchfork is a sign unique to the "folks" street gang.

Defendant maintains that Detective Taylor's testimony merely indicated that the word "folks" and the pitchfork sign are connected with gangs, but it does not prove that defendant or Carter was a member of a gang. The jury was free, however, to infer from Taylor's and Frazier's testimony collectively that defendant and Carter were both "folks," and we cannot say that such an inference would have been unreasonable.

The evidence clearly established that neither Frazier nor the deceased was "folks." This "gang" evidence was therefore relevant to show the purported motive behind defendant's and Carter's actions, starting with the fight between Frazier and defendant immediately

following their verbal altercation to the eventual and otherwise inexplicable shooting of the deceased. Moreover, the trial court allowed in only as much gang testimony as was necessary to establish this motive. We conclude that the probative value of this evidence outweighed any prejudicial impact it may have had on defendant.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RAKOWSKI and GIANNIS, JJ., concur.