2021 IL App (2d) 200427-U
No. 2-20-0427
Order filed December 3, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 11-CF-3081 |
| THOMAS T. ALBEA JR., | ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  At defendant's trial for first-degree murder for repeatedly striking the three-year-old victim in the stomach, causing massive and fatal internal injuries, the trial court did not abuse its discretion in excluding specific defense evidence offered to show that the victim's mother, not defendant, fatally beat the victim. First, though the defense offered the testimony of witnesses who would have described the mother's past physical abuse of the victim, those acts of abuse bore no similarity to the degree of abuse that caused the victim's death. Second, the mother's letter to defendant accusing him of cheating on her did not show a motive to falsely accuse defendant. The mother expressed sadness rather than anger, and she indicated that she still wanted to communicate with defendant. Finally, any error in excluding the evidence was harmless given the overwhelming evidence of defendant's guilt.

¶ 2 Following a jury trial, defendant, Thomas T. Albea, Jr., was convicted of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2010)) and sentenced to 33 years in prison. On appeal, defendant argues that the trial court abused its discretion by barring evidence that the three-year-old victim's mother (1) had committed prior acts of physical abuse against the victim and (2) wrote a letter to defendant in prison two months after the victim's death accusing defendant of cheating on her. We affirm.

¶ 3                              I. BACKGROUND

¶ 4 At about 11:30 p.m. on September 14, 2011, 3-year-old X.C. was at home playing a video game when he said a curse word. Upon hearing X.C. curse, 18-year-old defendant, who was dating X.C.'s mother, Q.C., punched X.C. multiple times in the stomach. X.C. died the next day at Lurie's Children Hospital from "massive intra-abdominal trauma," caused by "at least three different blunt force strikes of significant velocity and power," which were "consistent with a fist." At the time of the incident, Q.C. was asleep upstairs with her four-month-old daughter, N.C. No one else was present.

¶ 5 On October 12, 2011, defendant was indicted on 14 counts of first-degree murder (*id.* § 9-1(a)(1), (a)(2)) and 2 counts of aggravated battery of a child (*id.* § 12-4.3(a)). Following a bench trial, defendant was convicted of first-degree murder (*id.* § 9-1(a)(2)) and sentenced to 33 years in prison. On direct appeal, we reversed and remanded for a new trial because the trial court committed plain error in denying defendant's request to represent himself at trial. *People v. Albea*, 2017 IL App (2d) 150598. On remand, defendant requested, and was appointed, new counsel and elected a jury trial.

¶ 6 Before trial, defense counsel filed a motion *in limine* seeking to admit evidence of prior bad acts by Q.C.—specifically, evidence that Q.C. had previously physically abused X.C. The

motion argued that, because Q.C. was one of the last persons with X.C., evidence that Q.C. had previously abused X.C. was relevant to show that Q.C., rather than defendant, caused X.C.'s fatal injuries.

¶ 7     The motion named five witnesses, including defendant, and summarized their testimony. Marvin McBride would testify that (1) in 2010, he saw Q.C. "hit [X.C.] so hard he fell and hit the bumper of a car," then she "snatched him up off the ground by pulling X.C.'s arm"; and (2) in 2009 through 2010, he saw "[Q.C.] hit X.C. with an open hand all over X.C.'s body." Roxanne Brewton would testify that, in 2010, she saw Q.C. hit X.C. in the back with a belt buckle, and that, on several occasions, she saw Q.C. "hit X.C. in the arm with an open hand." Danielle Brewton would testify that, on one occasion, she saw Q.C. "hit[ ] X.C. in the upper shoulder area with an open hand," and that, on several occasions, she saw Q.C. "hit X.C. in the lower part of the body, the lower back, and stomach area." Melvin McBride would testify that, on one occasion, he saw Q.C. "hit X.C. in his shoulder blade so hard that X.C. spun around," and that he "often" saw Q.C. "strike X.C." Defendant would testify that (1) in 2010, he saw Q.C. "hit X.C. with an open hand in the back so hard that X.C. fell to the ground and started crying," (2) in 2011, he saw Q.C., while driving, reach into the back seat of the vehicle and "hit X.C. in the chest so hard that X.C. started to cry," and (3) in 2011, he saw Q.C. "hit X.C. with a white plastic hanger."

¶ 8     In response, the State argued that (1) there was no relation between any of the alleged acts and X.C.'s death, (2) none of the witnesses alleged injuries that were even remotely similar to the injuries that caused X.C.'s death, (3) the allegations, even if true, were too general, speculative, and remote to be admissible, (4) the witnesses were defendant's family members[1] and thus biased

---

[1] In its motion and at the hearing, the State referred to the individuals listed in defendant's

in defendant's favor, and (5) there was no evidence that anyone, other than defendant, caused the injuries that resulted in X.C.'s death.

¶ 9    Following a hearing, the trial court denied the motion, stating:

"I've gone through each of the allegations or each of the paragraphs in the motions [*sic*] concerning what you alleged to be prior bad acts that you urge would be admissible, and I can't for the life of me find any of the information that you've set forth which would be anything other than credibly [*sic*] speculative, remote and totally irrelevant to the issues in the underlying case here."

¶ 10    The State filed a motion *in limine* seeking to bar testimony regarding a letter that Q.C. sent to defendant in jail. The letter appeared to be postmarked November 2011 and read:

"Thomas,

I don't know where to start. What happen[e]d is what I want to know? And how could you cheat on me & have her in my house while I wasn't there who knows who ever [*sic*] else. Yes I know now that you were cheating on me. You lied to me and I was faithful as hell to you[,] did everything for you[.] I took care of you more than anybody, gave you money[.] Everything, took out a title loan for you. I GAVE YOU MY ALL TRUST LOVE & HEART and you do me like this[.] You just don't know how I feel[.] [I]f

_____

motion as defendant's relatives. Defendant did not dispute that fact below and does not dispute it on appeal. In any event, we note that, at trial, Q.C. testified that Danielle Brewton was defendant's mother. At an earlier hearing, Roxanne Brewton testified that she was Danielle Brewton's sister (and defendant's aunt) and that Marvin McBride and Melvin McBride were her children (making them defendant's cousins). Thus, we accept that these individuals were defendant's relatives.

you didn't want me tha[t']s all you had to say. You could have left if you ain [*sic*] wna [*sic*] be there instead of lien [*sic*][.] I thought you really loved me but I [see] it was all a lie. Every[ ]time you accused me of cheatin[g] its b[ecause] [yo]u were cheatin[g]. Y Y Y Y Y Y Y Y Y Y Y Y [*sic*] would you hurt me like this[?] I can't believe it. My heart is so broke[n] now. Just tell me why you did everything you did. I kno[w] [I']m not on the list to [see] you so [I']m writing you first [because] I kno[w] [yo]u [are] not go[ing] [to] write me back."

On the back of the envelope, Q.C. wrote "Please write back."

¶ 11    At the hearing on the motion, the State argued that the letter concerned a collateral issue and was not relevant to any material issue in the case. Defense counsel argued that the letter was relevant because it showed Q.C.'s consciousness of guilt and bias against defendant. The court responded: "Wait, that he cheated on her so she killed the baby?" Defendant responded that the fact that Q.C. believed that defendant cheated on her "could affect how she is testifying against him and exactly what she said he did nor didn't do that day." The trial court barred evidence of the letter.

¶ 12    The relevant evidence presented at trial established the following. On September 14, 2011, twenty-year-old Q.C. worked from 4:30 p.m. to 8:30 p.m. at Goodwill located in North Chicago. While Q.C. was working, X.C. and N.C. were being babysat by Danielle Brewton, the defendant's mother, at Brewton's home. Defendant, who was dating Q.C., was at Q.C.'s apartment in Waukegan. (X.C. and N.C. were not defendant's children.)

¶ 13    Q.C. arrived at Brewton's home around 9 p.m. to pick up X.C. and N.C. While there, Q.C. used Brewton's computer to type a paper for school, because she did not have a computer at home. According to Q.C., X.C. was watching television in the living room; X.C. was "acting fine, there

was nothing wrong with him." Q.C. described X.C. as "always happy, playful, cheerful." When it was time to leave, X.C. walked to the car without assistance.

¶ 14    Q.C. arrived at her apartment, along with X.C. and N.C., shortly after 10 p.m. Q.C. carried N.C. into the apartment, while X.C. walked in on his own; X.C. was "fine, there was nothing wrong with him." Defendant was present in the apartment when they arrived. Q.C. went upstairs to her bedroom, along with X.C. and N.C., to change the children into their pajamas. X.C. helped Q.C. change N.C.'s diaper, taking the diaper and throwing it into the trash. X.C. took off his jacket and shoes and went downstairs. Q.C. placed N.C. on the bed and then went downstairs to check on dinner. She saw X.C. and defendant playing video games. Q.C. went back upstairs, fed N.C., and put N.C. to sleep. Q.C. "dozed off" with N.C.

¶ 15    Q.C. woke up at 12:01 p.m. Shortly after, she received a telephone call from defendant. Defendant told her that "something was wrong, [X.C.] don't look right." Defendant told her that X.C. "was woozy." As Q.C. was getting ready to walk downstairs, she encountered defendant, who was walking X.C. upstairs. X.C. "was looking kind of a little pale, he couldn't really talk." When Q.C. first asked X.C. what was wrong, X.C. "said nothing," but when she asked a second time, X.C. told her that his stomach hurt. When Q.C. asked him where and why it hurt, X.C. did not say anything. When Q.C. asked defendant if he knew what was wrong with X.C., defendant told her that "nothing happened." The last time Q.C. had seen X.C., "nothing was wrong, he was still happy and smiling."

¶ 16    Q.C. decided to take X.C. to the hospital "[b]ecause [she had] never seen him like that before." Q.C. put X.C.'s shoes and coat on him, and defendant helped Q.C. bring X.C. to the car. Q.C. put N.C. in the car. Defendant did not want Q.C. to take X.C. to the hospital, and he did not go with them. Defendant did not give her a reason as to why he did not want to go along. On the

way to Vista West Hospital (Vista West), which was about a six- or seven-minute drive away, Q.C. had to stop the car because X.C. was "lean[ing] over towards the window." Q.C. sat X.C. up straight. X.C. was still breathing, but he was "kind of like slouched over." Q.C. asked X.C. several times if he was okay. X.C. responded only one time, telling her that he was okay.

¶ 17    While at Vista West, Q.C. received several text messages from defendant. She identified People's exhibit No. 48 as a printout of her text exchanges with defendant. The printout showed that the first message from defendant came in at 1:03 a.m. Defendant asked Q.C. if he could have $2.00. Q.C. could not respond immediately because she was standing at X.C.'s bedside, holding his hand. Over several messages, defendant inquired about what was happening with X.C., complained when Q.C. did not respond quickly enough, complained that Q.C. "sent da police here like I hurt him or sumn," asked Q.C. when she was going to be home, asked Q.C. to buy him a cigar, told Q.C. that he was "n a fukkn police car," and, when Q.C. told defendant that "dey jus left with him [X.C.]," concluded with "so wut about me."

¶ 18    Waukegan police officer Drew Summers was dispatched to Q.C.'s apartment at about 1:30 a.m. to learn what had happened to X.C. Summers arrived at the same time as Waukegan police officer Christopher Rohloff and Waukegan police sergeant Joseph Kreppein. Defendant answered the door and allowed the officers inside. When they asked defendant about X.C.'s injuries, defendant stated that he and X.C. had been playing video games while seated on the couch and that, when X.C. got up to walk to the kitchen, X.C. fell and struck his mouth on the hinge of a nearby door. Summers identified photographs taken of the inside of the apartment, including a photograph of the hinge. Summers did not observe any blood on the hinge. Defendant told him that after X.C. fell, they went to the kitchen so that X.C. could eat. As X.C. was eating, defendant saw blood inside X.C.'s mouth. Defendant used paper towels to dab the blood from X.C.'s mouth.

Defendant thought the blood was from a cut on X.C.'s lip or possibly X.C.'s tongue. Defendant showed Summers the bloody paper towels in the garbage. Defendant also told Summers that X.C. appeared to be going in and out of consciousness and that defendant became worried and brought X.C. upstairs to his mother. When Summers asked defendant if there was anything else that might have happened to X.C., defendant told him that X.C. may have fallen earlier and hit his head on the stairs. When Summers asked defendant to describe what had occurred, defendant was unable to do so. Defendant never told Summers that X.C. used profanity that night or that he had hit X.C. When Summers went outside to discuss the situation with the other officers, he observed defendant throwing the trash bag containing the bloody paper towels into a nearby dumpster. The officers then went to Vista West, where Kreppein conveyed the information to medical personnel.

¶ 19    In the meantime, X.C. was being treated at Vista West. Medical personnel performed a scan of X.C.'s abdomen, which revealed massive bleeding and a clear intestinal injury. X.C. was transported to Lurie's Children Hospital (Lurie's) via helicopter. At about 1:50 a.m., Dr. Katherine Ann Barsness, a pediatric trauma surgeon at Lurie's, was contacted and thereafter directed X.C.'s entire care. Barsness testified that, before transport, X.C. had "a full cardiac arrest or full code event" and stopped breathing. The transport team "put an airway in" and began "chest compressions." X.C. received 25 minutes of CPR. Because "the CT scan showed a massive amount of blood in the abdomen," Barsness had instructed "the transport team to get blood started." X.C. received four units of blood before leaving Vista West. He "had bled out most likely almost all of his blood volume into his abdomen so this is a catastrophic massive injury to his abdomen." He received another two units of blood while in the transport helicopter.

¶ 20    After X.C. had been transferred from Vista West to Lurie's, Q.C. went to the Waukegan police station and was interviewed by two or three police officers, including Waukegan police

detective Alejos Villalobos. She was at the police station for about three hours and provided a written statement. Afterwards, she went to Lurie's to be with X.C., arriving around 4:58 a.m.

¶ 21 Barsness testified that "[i]t was clear on arrival that [X.C.] was horrendously injured." She described in great detail X.C.'s physical condition and the various efforts made to save his life. She detailed the two surgeries she performed and her observations of X.C.'s body during surgery. She testified that X.C. received an additional 24 units of blood while at Lurie's. She identified numerous photographs showing X.C.'s abdomen and "highlighting some of the extensive injuries to the small intestines" that she observed during her initial operation. In describing one of the photographs, she noted that X.C.'s intestines were outside of his body. She explained that the swelling of his intestines was "consistent with a significant massive horrendous injury to the intestines." When asked what type of force would cause such an injury, she stated "Massive force."

¶ 22 Barsness testified that, at about 6:40 a.m., after the initial surgery, X.C. was transferred to the pediatric intensive care unit. Barsness identified numerous photographs of X.C. in the ICU and the various medical equipment used to support him. X.C. required a second surgery, which Barsness performed in the intensive care unit because X.C. was too sick to be moved to the operating room. At about 4:30 p.m. or 4:45 p.m., X.C. suffered another cardiac arrest. The medical team began CPR, but X.C. eventually succumbed to his injuries.

¶ 23 Barsness opined that X.C. "died of massive intra-abdominal trauma. Massive trauma that led to hemorrhagic shock and very early death." When asked how long after the injuries occurred would X.C. have been able to move around, Barsness responded:

"[I]f you have this type of injury you wouldn't move around, you wouldn't play, you wouldn't run. This is a catastrophic injury, we know he started bleeding immediately from

it because there was no connection of the intestines and blood vessels. We don't tear intestines off of blood vessels and walk around. He started bleeding immediately." Barsness stated that one strike could not have caused the injuries "because they are completely separate areas." She testified: "This was at least three different blunt force strikes of significant velocity and power." The strikes that occurred would be "consistent with a fist."

¶ 24    At about 4 a.m. that morning, before X.C. had died, Summers returned to Q.C.'s apartment and asked defendant to accompany him to the police station to write down what he had earlier told Summers. Defendant agreed. Waukegan police detective Jason Gutke interviewed defendant in a room not equipped with recording equipment. Villalobos, who had previously interviewed Q.C., was also present. During the unrecorded interview, defendant told Gutke that he "basically lived with Q.C." although he sometimes stayed at his mom's house. Defendant told him that he arrived at Q.C.'s around 6 p.m. Q.C. arrived home around 11 p.m. with X.C. and N.C. Defendant helped Q.C. with the children and then asked X.C. if he wanted to play video games. Defendant and X.C. went downstairs while Q.C. remained upstairs with N.C. Defendant "set up Mortal Combat for [X.C.] to play" while defendant cooked dinner. Defendant walked over to X.C. to see how he was doing, when X.C. said, " 'Fuck, they got me.' " At that point, defendant "grabbed the remote control from him and punched him in the stomach." X.C. told defendant that he was sorry and defendant returned the remote to him. Defendant then finished cooking dinner. Defendant told Gutke that "he did not know how hard he hit [X.C.] [but] he didn't think it was that hard."

¶ 25    According to Gutke, defendant told him that he finished making dinner and asked X.C. if he wanted to eat. X.C. said to him that he was hungry. When X.C. got up off the couch, he fell and hit the side of his face. When X.C. sat down at the kitchen table, defendant sat on the couch to play "Mortal Combat." Defendant heard gagging sounds. He looked over and saw that X.C. had his

head down. Defendant saw that X.C.'s tongue was bleeding, so he wiped X.C.'s mouth with wet paper towels. Defendant believed that X.C. bit his tongue when he fell. Defendant "could tell that something wasn't right, that [X.C.] almost looked like he was going to blackout or that that he was in and out of consciousness." He splashed water on X.C.'s face. Defendant called Q.C., who was upstairs with N.C., and told her that something was not right with X.C. Defendant began to walk X.C. upstairs, and X.C. fell again. Q.C. came downstairs and immediately said that X.C. needed to go to the hospital. Q.C. took both children and went to the hospital. When Gutke asked defendant why he did not go with them, defendant told him that X.C. was "not his son" and "not his responsibility." Gutke asked defendant if he would prepare a written statement. Defendant agreed to and did so. It was admitted into evidence as People's exhibit No. 44.

¶ 26    Defendant's handwritten statement, which was prepared at 6:25 a.m., was consistent with Gutke's testimony regarding defendant's statements during the interview. In the written statement, defendant stated that, when X.C. cursed, defendant "tried to hit [X.C.] in [the] hand but [X.C.] jumped and [defendant] accidental[l]y hit [X.C.] in the stomach." He also stated: "I don't know how hard I hit X.C. but I didn't mean to hit him that hard."

¶ 27    After the interview, Gutke received additional information from the hospital concerning X.C.'s condition. According to Gutke, because the law requires recording of homicide investigation interviews, they decided to conduct a recorded interview with defendant. Gutke identified People's exhibit No. 45 as a copy of the video-recorded interview with defendant recorded at about 7:50 a.m. on September 15, 2011. The video was played for the jury. In the recorded interview, defendant's version of the events of the incident was consistent with Gutke's testimony regarding the unrecorded interview. During much of the interview, defendant persisted in his claim that he hit X.C. only once. Defendant stated that he was sitting on X.C.'s left on the

couch and, when X.C. swore, he "punched him" once with his right hand. Defendant demonstrated how he hit X.C. However, toward the end of the interview, after the officers told defendant about the extent of X.C.'s injuries, defendant admitted that he hit X.C. four or five times. Defendant then added the following language to the end of his written statement: "After thinking about the situation I realized that I hit X.C. 4 or 5 times. I was very upset that I did it because he is still young but he knows the difference between wrong and right."

¶ 28 Ponni Arunkumar, chief medical examiner with the Cook County Medical Examiner's Office, performed X.C.'s autopsy. During the external exam, Arunkumar observed four circular bruises on X.C.'s chest and upper abdomen, which were "consistent with a fist when the fingers are closed." During the internal exam, Arunkumar observed additional bruising on X.C.'s arms, back, legs, and forehead. As a result, Arunkumar opined that X.C. died as a result of blunt force trauma.

¶ 29 For the defense, Waukegan police detective Keith Zupec testified that, at 4 a.m. on September 15, he was called in to work by Kreppein, who told him that a three-year-old child had sustained blunt force trauma. Kreppein called in Villalobos and Gutke to help work on the case. When Zupec arrived at the police station, he had learned that X.C. had been flown to Lurie's and that the injuries were more serious than originally thought. Gutke and Villalobos had information about the case before interviewing defendant. When Zupec learned that X.C.'s condition was "grave," he told Gutke and Villalobos that the interview needed to be recorded.

¶ 30 Kreppein testified that he was one of the officers who went to Q.C.'s apartment at 1:30 a.m. and again at 4 a.m. Defendant was cooperative and respectful. After defendant left with Summers, Kreppein called in evidence technicians, who took pictures of the downstairs area and collected a bag of trash from the dumpster. No one searched the apartment or went upstairs.

¶ 31    The jury found defendant guilty of first-degree murder and aggravated battery.

¶ 32    Defendant filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. He argued, among other things, that the trial court erred in barring evidence of Q.C.'s prior bad acts and the letter Q.C. had written to defendant. The court denied the motion. Following a sentencing hearing, the trial court sentenced defendant to 33 years in prison. The court later denied defendant's motion for reconsideration of his sentence. This timely appeal followed.

¶ 33                              II. ANALYSIS

¶ 34    Defendant argues that the trial court abused its discretion by barring defendant from introducing evidence that Q.C. (1) had committed prior acts of physical abuse against X.C. and (2) wrote a letter to defendant in prison two months after X.C.'s death accusing defendant of cheating on her. The State responds that the evidence was properly barred and, alternatively, that any error was harmless given the overwhelming evidence of defendant's guilt. We agree with the State.

¶ 35    The admissibility of evidence is within the trial court's discretion, and its decision will not be disturbed absent an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. We will find an abuse of discretion only where "the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *People v. Gaciarz*, 2017 IL App (2d) 161102, ¶ 47.

¶ 36    "Although it is true that a defendant is entitled to all reasonable opportunities to present evidence which could create a doubt as to his guilt, the evidence offered must be relevant and material in order to be admissible." *People v. Smith*, 122 Ill. App. 3d 609, 615-16 (1984). " 'Relevant evidence' " is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). A defendant may, within certain limits, attempt to prove that someone else committed the crime with which he is charged. *People v. Ward*, 101 Ill. 2d 443, 455 (1984). The trial court has discretion to determine whether the offered evidence "tends to make the question of guilt more or less probable; *i.e.,* whether it is relevant." *Id.* Remote, nonspecific, and speculative evidence that the crime could have been committed by someone else is properly excluded. See *People v. Thomas*, 145 Ill. App. 3d 1, 12-13 (1986) (where there was no direct evidence that the defendant's brother committed the offense and he denied doing so, the trial court properly excluded, as speculative, testimony from the defendant's family members that the brother resembled the defendant, had impersonated the defendant in the past, was at the party where the offense occurred, arrived home out of breath at 5 a.m. after the party, and changed his appearance shortly after the offense).

¶ 37    Defendant argues that the proposed testimony about Q.C.'s physical abuse of X.C. would show Q.C.'s propensity to abuse him physically, and, thus, it was relevant to demonstrate that Q.C., rather than defendant, caused X.C.'s fatal injuries. In support, defendant directs us to *People v. Donoho*, 204 Ill. 2d 159 (2003). At issue in *Donoho* was whether, at the defendant's trial on one count of criminal sexual assault and four counts of aggravated criminal sexual abuse, the trial court abused its discretion in admitting, under section 115-7.3(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2010)), evidence of the defendant's 1983 conviction of indecent liberties with a child, which had occurred 12 to 15 years before the conduct at issue. *Donoho*, 204 Ill. 2d at 162-63. Section 115-7.3 of the Code sets forth, for sexual assault cases, a limited exception to the prohibition on other crimes evidence to show propensity. *Id.* at 176. Under that section, in weighing the probative value of the evidence against undue prejudice, the court may consider: " '(1) the proximity in time to the charged *** offense; (2) the degree of factual

similarity to the charged *** offense; or (3) other relevant facts and circumstances.' " *Id.* at 183 (quoting 725 ILCS 5/115-7.3(c) (West 1998)). The supreme court found that the 1983 conviction was properly admitted. *Donoho*, 204 Ill. 2d at 186. The court noted that, although the passage of 12 to 15 years since the prior offense may lessen its probative value, there were "substantial factual similarities about the nature of the abuse to justify the admission of the other-crimes evidence." *Id.*

¶ 38    Defendant argues that, based on *Donoho*, the trial court abused its discretion in refusing to admit evidence showing that Q.C. had a propensity to physically abuse X.C. Defendant asserts that the court's finding that the evidence was "remote" and "speculative" cannot be sustained under *Donoho*, because the witnesses personally observed the incidents, which occurred within three years of the charged offense. We disagree.

¶ 39    The trial court stated, without elaborating, that it found the alleged acts "speculative, remote and totally irrelevant to the issues in the underlying case." The court did not refer to the incidents being remote *in time*. It is more likely that, by "remote," the court meant that the alleged incidents had *very little connection* with the offense at issue. Indeed, as noted in *Donoho*, " 'to be admissible, other-crimes evidence must have 'some threshold similarity to the crime charged.' " *Id.* at 184 (quoting *People v. Bartall*, 98 Ill. 2d 294, 310 (1983)). As factual similarities increase, so does the relevance of the evidence. *Id.*

¶ 40    Here, the proposed evidence would generally establish that defendant and his relatives had, on prior occasions, witnessed Q.C. physically abuse X.C. The specific acts of abuse included (1) numerous instances where Q.C. had "hit X.C. with an open hand"; (2) one instance where Q.C. "snatched [X.C.] up off the ground by pulling X.C.'s arm"; (3) one instance where Q.C. hit X.C. in the back with a belt buckle; and (4) one instance where Q.C. hit X.C. with a white plastic hanger.

Factual similarities are lacking between these acts and the acts that caused X.C.'s death. Barsness testified that X.C. "died of massive intra-abdominal trauma. Massive trauma that led to hemorrhagic shock and very early death." She testified that it was caused by "at least three different blunt force strikes of significant velocity and power." She testified that the strikes were "consistent with a fist." Arunkumar confirmed four circular bruises on X.C.'s chest and upper abdomen that were "consistent with a fist when the fingers are closed." None of the proposed witnesses, which we note were defendant himself and his family members, would testify that they had seen Q.C. punch X.C., much less that she had ever repeatedly punched X.C. in the stomach with massive force.

¶ 41    Given the lack of similarities between Q.C.'s prior acts against X.C. and the injuries that caused X.C.'s death, the admission of this evidence would cause nothing but mere speculation that Q.C. caused X.C.'s death. We find no abuse of discretion in the trial court's refusal to allow the evidence, as it was not relevant to the issue of whether defendant's acts caused X.C.'s death.

¶ 42    Defendant next argues that the trial court abused its discretion by barring defendant from introducing, as evidence of Q.C.'s bias against defendant, a letter that Q.C. had mailed to defendant in prison two months after the murder accusing him of cheating on her. When impeaching a witness by showing a motive to testify falsely, " 'the evidence used must potentially give rise to the inference that the witness has something to gain or lose by [her] testimony,' and therefore the evidence used must not be remote or uncertain." *People v. Triplett*, 108 Ill. 2d 463, 475-76 (1985) (quoting *People v. Phillips*, 95 Ill. App. 3d 1013, 1020 (1981)). According to defendant, the letter showed that Q.C. was "extremely angry" at defendant and that the jury "could interpret her anger toward the defendant as bias that could lead her to falsely implicate [defendant]."

¶ 43    We find no abuse of discretion in the trial court's refusal to allow this evidence. We disagree with defendant's interpretation of letter; more specifically, defendant's claim that Q.C. was "extremely angry" such that she would falsely implicate defendant. To be sure, the letter indicated that Q.C. was upset with defendant over the fact that he cheated on her. However, Q.C. expressed her feelings in terms of being "hurt." She told defendant that her "heart [was] so broke[n]." The letter did not contain any threats against defendant or have a vengeful tone. Indeed, Q.C. expressed her desire to have further communications with defendant, writing on the envelope, "Please write back." This in no way shows a bias on the part of Q.C. to falsely implicate defendant. We note, too, that at no point in her testimony did Q.C. ever directly implicate defendant.

¶ 44    Even if we were to find that the trial court abused its discretion in barring the challenged evidence, reversal would be unwarranted. Evidentiary errors are harmless where "there is no reasonable probability that the jury would have acquitted the defendant absent the error." *People v. McBride*, 2020 IL App (2d) 170873, ¶ 34. Defendant argues that the evidence established that X.C. was beaten at a time and place where only the defendant and Q.C. had access to him. Thus, according to defendant, had the jury known that Q.C. had a propensity to abuse X.C. physically and that she was angry at defendant for cheating on her, there is a reasonable probability they would have acquitted him. We disagree.

¶ 45    To find defendant not guilty, the jury would have had to find that Q.C. punched X.C. in the abdomen with "[m]assive force" multiple times *before* X.C. walked downstairs and played video games with defendant. The medical evidence and defendant's multiple statements to the officers do not support that version of events. Barsness testified that X.C. began bleeding immediately after being struck and would not have been able to "move around" or "play." Defendant told officers that, after X.C. came downstairs, X.C. played video games, said he was hungry, and started to eat

dinner. X.C.'s alleged behavior is not consistent with his having just been violently punched in his abdomen multiple times by his mother before coming downstairs. Given defendant's confession that he punched X.C. four to five times and the medical testimony regarding the cause of death, there is no reasonable probability that, had the jury heard the barred evidence, it would have found defendant not guilty.

¶ 46                                III. CONCLUSION

¶ 47      For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 48      Affirmed.